813 P.2d 710

**Earl M. BURKONS, Plaintiff/Appellant,**

**v.**

**TICOR TITLE INSURANCE COMPANY OF CALIFORNIA, a California corporation, Defendant/Appellee.**

**No. CV–90–0292–PR.**

Supreme Court of Arizona,
En Banc.

June 18, 1991.

Reconsideration Denied Aug. 16, 1991.

**346**

Jennings, Strouss & Salmon by Timothy W. Barton, Michael R. Palumbo, Carol A. Cluff, Diane R. Flaaen, Phoenix, for plaintiff/appellant.

Streich Lang by Robert E. Miles, Timothy J. Thomason, Phoenix, for defendant/appellee.

Molloy, Jones & Donahue, P.C. by Russell E. Jones, Gary F. Howard, Tucson, for Stewart Title & Trust.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by John H. Westover, Franzula M. Bacher, Larry L. Smith, Phoenix, for Land Title Ass'n.

## OPINION

FELDMAN, Vice Chief Justice.

Ticor Title Insurance Company of California (Ticor) petitioned us to review a court of appeals' opinion, claiming that the court had improperly expanded the duties and obligations of an escrow agent, creating obligations not previously imposed by law. *See Burkons v. Ticor Title Ins. Co.*, 165 Ariz. 299, 798 P.2d 1308 (Ct.App.1989). Because the facts raised important legal questions concerning the obligations of es-

crow agents doing business in this state, we granted review on all issues. *See* Rule 23, Ariz.R.Civ.App.P., 17B A.R.S. Having permitted briefing by various amici, who submitted the views of the industry on the issues presented by the case (Rule 16, Ariz. R.Civ.App.P., 17B A.R.S.), and having heard oral argument, we conclude that we agree with the disposition made by the court of appeals and reverse the judgment of the trial court. We have jurisdiction under A.R.S. § 12–120.24 and article 6, § 5(3) of the Arizona Constitution.

## FACTS

This case, and two others consolidated for argument,[1] arise from a series of seven transactions in which an entity known as Pyramid I (Pyramid) purchased various parcels of real estate from different sellers. There are some factual differences between the three cases before us, but the essential outlines of Pyramid's scheme are the same for each and evidently for all seven of the transactions.

### A. General Scheme

In each case, Pyramid contracted to purchase real property from an unsophisticated seller for a low down payment and agreed to secure the balance of the purchase price with a note secured by a deed of trust. In each case, the seller agreed to subordinate the purchase money deed of trust to a loan that Pyramid was to obtain. For summary judgment purposes, we must assume that the seller was led to believe the loan would be used to finance construction on the property being sold. Although Pyramid supplied the seller with a letter of intent describing the construction it contemplated financing, the letter avoided any express commitment to use the loan proceeds for that purpose.

Pyramid, indeed, obtained a loan on each parcel, usually for at least fifty percent of the total sale price of the property, and, in each instance, the seller's deed of trust was subordinated and priority given to the lien of the buyer's lender. No construction was ever commenced.[2] The buyer defaulted on each note and deed of trust sometime after closing and walked away from its obligations. This left the seller's purchase money obligations in second position.

The construction loan was actually used to finance the down payment. Worse, the escrow agent disbursed the remainder of each loan to the buyer without restriction, and the money presumably wound up in the buyer's pocket. In at least six of these transactions, including the three before us, Ticor was the escrow agent. The transaction in this case was the third in the series.

### B. Facts of This Case

Burkons owned a parcel of property near Northern Avenue and Black Canyon Freeway in Phoenix. His brother-in-law, Arthur Schnitzer, held a power of attorney authorizing him to sell the property on Burkons' behalf. Schnitzer completed the transaction but died before he could testify. The record on review[3] reveals that in 1983, Schnitzer agreed to sell the property to Pyramid, a joint venture composed of Mark Masias, Dr. Dennis Noss, and Domenico Spano. The purchase price was to be $135,000, of which Pyramid was to pay less

---

**1.** *Manley v. Ticor Title Ins. Co.,* No. CV–90–0293–PR, and *Cline v. Ticor Title Ins. Co.,* No. CV–90–0498–PR.

**2.** Apparently Pyramid created some appearance of construction on one property. The real estate agent's description follows:

Q: Why did it cause you concern that there wasn't anything happening with the properties?

A: Well, he started to building on the Manleys' property. He didn't—he didn't know anything—he didn't get a permit from the County to add on to build the restaurant. It was all make shift type of construction. It was all for show. I wouldn't build a stable for a horse the way he was building that restaurant.... And I said, 'This is no restaurant. What he's doing is stalling for time or something, he is not really building anything.' Deposition of George Stika, July 25, 1986, at 11–12.

**3.** The facts set forth are drawn from Defendant's Uniform Rule IV(f) Statement of Uncontroverted Facts and exhibits thereto (filed Aug. 6, 1986), and Plaintiffs' Uniform Rule IV(f) Statement of Uncontroverted and Disputed Facts and exhibits thereto (filed Jan. 9, 1987).

than twenty percent at close of escrow, with the balance of $110,000 to be evidenced by a promissory note from Pyramid to Burkons. The note was to be secured by a deed of trust. The purchase contract contained a handwritten provision that stated: "escrow to contain subordination agreement drawn up by buyer's attorney on form acceptable to title company. Escrow to contain letter of intent as to amounts and use...." The parties supplemented the contract to provide that the buyer "may not place another lien of any type against this property without written permission from the seller."

Ticor was named escrow agent, and its escrow officer, Joyce Yancy, prepared escrow instructions based on the purchase contract. The escrow instructions were signed by the parties and provided that the purchase money note would be secured by "first lien deed of trust." The instructions also provided that the seller was to "accept and approve in writing a subordination agreement, letters of intent with financial statement." In fact, Pyramid prepared such a letter of intent, which read:

To Whom it May Concern:

Rev. Domenico Spano and Dr. Dennis B. Noss formed a joint venture to construct a medical complex on the project mentioned. We, therefore, intend to start construction as soon as approval is met. We have contracted for the property to be carefully master planned by ... and hope our site plan is ready by December 1, 1983.

Because of our building methods, subordination will be minimal, approximately fifty percent of the selling price.

Reading this closely, one finds great promise of a medical center but no express promise to build one. As it turned out, Pyramid borrowed $67,000 from Tower Acceptance and Services Corp. (Tower). The

subordination agreement prepared by Pyramid and signed by Burkons expressly incorporated the letter of intent quoted above. Ticor filled in the blanks of the signed subordination agreement with the specifics of the Tower loan and the Burkons purchase money lien.

The Tower loan was closed at another title company, which remitted to Ticor $46,705.69 out of the $67,000 Tower obligation and retained the $20,000 plus difference for commissions, loan fees, and prepaid interest. Of the funds received by Ticor, $24,000 was used by Pyramid for the down payment at closing.[4] Ticor paid the remainder of approximately $22,000 to Pyramid at the close of escrow. Ticor then recorded the lien documents in the following order: the Tower deed of trust, the Burkons deed of trust, the subordination agreement, and the letter of intent. Thus, Burkons argues, as far as the county recorder's records showed, the Burkons deed of trust was junior to Tower's, both because of the order of recording the liens and the fact that the subordination agreement was recorded. Ticor did not inform Burkons of the source of Pyramid's down payment or the fact that the property was to be "over-encumbered."[5]

Pyramid did not improve the property and defaulted on its payments to Burkons. The record does not reveal whether Burkons has collected anything on Pyramid's note or taken any action to foreclose his purchase money deed of trust. Sixteen months after close of escrow, Burkons did bring this action against Ticor, asserting five counts for relief. These are:

Count 1: Breach of contract for recording the deeds of trust and the subordination agreement in such a manner as to subordinate Burkons' lien to anything other than a construction loan; count 2: breach of duty for failure to follow the

---

4. Pyramid had paid $1,000 as earnest deposit, presumably its own money and, from this record, the only money it ever advanced on this transaction.

5. We use the term "over-encumbered" to describe situations such as the present case, where the combination of liens exceeds the property's

value and sale price and where the proceeds of the lien taking priority to the seller's purchase money obligation have not been used to improve the value of the property. Although "over-encumbered" is not a legal term of art, we use the word because Ticor used it to describe such situations.

instructions in the escrow agreement; count 3: breach of fiduciary duty for failure to disclose known fraud; count 4: liability for bad faith breach of contract; count 5: damages for emotional and mental distress.

The trial court dismissed the bad faith count for failure to state a claim and granted summary judgment to Ticor on the remaining counts, awarding it $35,000 in attorney's fees. A divided court of appeals reversed on all counts and awarded fees on appeal to Burkons. *Burkons*, 165 Ariz. at 313, 798 P.2d at 1322. We granted Ticor's petition for review.

## DISCUSSION

Ticor presents six issues that fall into four categories. The first deals with the interpretation of the agreement between the parties, specifically whether the parties intended to subordinate Burkons' lien if the buyer's loan was not to be used to improve the property. The second deals with Burkons' assertion that an escrow agent has a duty to disclose fraud. The third with the bad faith issue, and the fourth with attorney's fees. We address those issues in turn.

## A. The Contract

In the first two counts of the complaint, Burkons alleged that Ticor had breached the escrow instructions and its fiduciary duty as an escrow agent in two ways. The first is based on Burkons' view that the agreements with Pyramid only allowed subordination to a construction loan. By recording the documents as it did, Burkons contends, Ticor effectively subordinated his lien to a loan that was not used for construction, thus breaching both the escrow instructions and its obligation to carry out the intent of the parties as stated in their contract.

The court of appeals held that when the documents were read together, "no trier of fact could reach any other reasonable interpretation than that Burkons signed the subordination agreement because he believed that Pyramid intended to construct improvements on the purchased land with loan proceeds obtained from Tower." *Burkons*, 165 Ariz. at 305, 798 P.2d at 1314. Thus, the majority concluded, Pyramid breached the contract by using the Tower loan for the down payment and by pocketing the rest of the loan proceeds, and, by permitting this, Ticor breached the escrow agent's duty to comply with the escrow instructions.

Burkons also complains that Ticor breached its contractual obligations by the order in which it recorded the documents: the Tower loan documents first, then the Burkons lien documents, and then the subordination agreement. The rationale, evidently, is that by using that order of recording, Ticor placed Burkons in a second position to Tower even if Burkons was successful in having the subordination agreement rescinded or nullified by legal action. In Burkons' view, such a result would be futile because the order in which Ticor recorded the liens left Burkons in second position regardless of any subordination agreement. The court of appeals agreed. *Id.* at 306–07, 798 P.2d at 1315–16.

Judge Brooks, dissenting, argued that the essential issue on all breach of contract counts turned on the interpretation of the agreements:

> The issue is whether Ticor had "notice that the parties intended to subordinate only to a construction loan. If so, Ticor's later knowledge that Pyramid I was using the loan as the source of its down payment raises factual issues concerning Ticor's duty to disclose this information ... and to seek clarification before closing escrow."

*Id.* at 313–14, 798 P.2d at 1322–23. We agree with Judge Brooks' characterization of the issue but not with his proposed disposition.

### 1. *Interpretation*

Neither the letter of intent nor the escrow agreement contains an express commitment to use the loan proceeds for construction. We cannot agree, however, with the trial court's holding and Judge Brooks' view that, as a matter of law, the result is "an unconditional subordination of Bur-

kons' deed of trust" to any loan the buyer might place, no matter how the loan proceeds were to be used. Minute Entry, Mar. 20, 1987; *Burkons,* 165 Ariz. at 314, 798 P.2d at 1323.

The instruments contain no explicit language on this point and, for several reasons, we believe, cannot be so interpreted as a matter of law. First, though the letter of intent does not make an express commitment regarding the buyer's use of the loan proceeds, it strongly implies that they will be used for construction. Of course, if the loan were used to finance construction, the value of the property would be increased, hopefully in an amount equal to the cost of the building constructed. Thus, Burkons would remain at least partially secured even though he had subordinated his purchase money lien to that of the construction lender.

It is equally obvious that if the so-called construction loan were not used to improve the property, Burkons' purchase money lien would have little if any value. Common sense tells us that no rational seller would agree to subordinate his or her purchase money lien to a loan like the Pyramid–Tower obligation. *Miller v. Citizens Sav. & Loan Ass'n,* 248 Cal.App.2d 655, 663, 56 Cal.Rptr. 844, 851 (1967) ("[w]hile it may not be impossible that a vendor has agreed to subordinate his purchase money lien [placed] by the purchaser [and] to be used for purposes entirely apart from the mutual enterprise [*i.e.,* development of the property], such an arrangement would be so unusual and so unlikely that we would require it to be spelled out with particularity"). Indeed, it is difficult to imagine why a seller would agree to the destruction of his or her own security, and that certainly is a factor to be considered in interpreting an agreement that is hardly a model of clarity.

Second, Ticor's internal documents acknowledge that the type of loan placed by the buyer in this transaction is very unusual and raises indicia of fraud to the extent that Ticor will not generally accept employment as an escrow agent in such circumstances. Interpreting the documents in a manner that would reach such a result is certainly strained.

Finally, the conclusion that Burkons manifested an intention to subordinate unconditionally is diametrically opposed to the provision of the escrow instructions that Burkons' purchase money deed of trust was to be a first lien and that Pyramid could not place "another lien" without Burkons' "written permission." The instructions provided for a subordination agreement, not yet drawn, that Burkons would have the right to "accept and approve," together with "letters of intent." The purchase contract required Pyramid to specify the "amount and use" of the loan proceeds in the letter of intent. Ticor received these documents into escrow, and the letter of intent was attached to and expressly incorporated into the subordination agreement. A reasonable, if not unavoidable, interpretation of these provisions is that subordination was conditional on something, and the letter of intent made it fairly evident that the intended use of the loan funds was for construction.

Given these points, we are unable to agree that, as a matter of law, the documents committed Burkons to an unconditional subordination of the purchase money lien. Ticor argues, however, that the trial court construed the contract to the contrary and that the construction of the contract is a question of law for the trial court. There are two answers for that. The first is that even where a contract is so plain and unambiguous that construction is a question of law, this court is not required to accept the legal conclusions of the trial judge but is free to draw its own legal conclusions. *Smith v. Melson,* 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983). The second answer is that we are not limited to considering only the text of the agreement. *Id.* at 122, 659 P.2d at 1267 (citing Restatement (Second) of Contracts § 212 (1981); J. MURRAY, CONTRACTS § 108 (1974)). In *Melson,* writing for a unanimous court, Chief Justice Holohan committed Arizona to the Corbin view of interpretation: where there is no explicit provision covering the problem and the court must therefore *interpret* the contract, "the court may al-

ways consider the surrounding circumstances," guided by "the 'tentative rules of interpretation based upon ... experience,' " and what Corbin elsewhere simply refers to as common sense. *Melson,* 135 Ariz. at 122, 659 P.2d at 1267 (quoting 3 A. CORBIN, CONTRACTS § 535, at 19–20 (1960)); *see also* 3 A. CORBIN, *supra* § 536, at 34. In fact, in Corbin's view, the court should consider all of the surrounding circumstances to determine the extent of the integration and the interpretation of the agreement. *Darner Motor Sales v. Universal Underwriters,* 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984) (citing 3 A. CORBIN, *supra* § 582).

If by some stretch of the imagination one could find the subordination provisions clear and unambiguous, even though not explicit on the precise question presented, we would indeed reject the interpretation advanced by Ticor as being at best "strained" (*see Melson,* 135 Ariz. at 121, 659 P.2d at 1266), and at worst completely unrealistic. Interpreting an agreement containing no explicit requirement for unconditional subordination, we do not believe that a court could conclude as a matter of law that the agreement expresses an intent contrary to any reasonable business objective unless it found that one party had been incompetent to make the contract, had been led to do it through fraud, or both. *See Miller,* 248 Cal.App.2d at 663, 56 Cal.Rptr. at 851.

But the "contract" in question is far from clear. In fact, it is difficult to tell just what constitutes "the contract." There is a purchase contract between Burkons and Pyramid, there are escrow instructions prepared by Ticor and signed by the parties, there is a subordination agreement, and there is a letter of intent incorporated into the subordination agreement. Assuming that all of these documents are to be "integrated" and form a contract, it contains no explicit provision governing the question of subordination. The documents, moreover, are hardly models of clarity, are far from complete, do not even purport to cover all of the questions that may arise, and in fact leave many important items not provided for.

As Corbin notes, courts are called on to interpret such agreements because the words chosen by the parties insufficiently express and convey their intent. 3 A. CORBIN, *supra* § 538, at 70–71. In ascertaining this intent, it is necessary to look to "other expressions and surrounding circumstances as well as ... the chosen contract words." *Id.* at 70. Are there other agreements between the parties, oral or written, that were intended to be part of the contract? This is a question on which the factfinder must hear evidence. *Darner,* 140 Ariz. at 393, 682 P.2d at 398; *Melson,* 135 Ariz. at 122, 659 P.2d at 1267. So also is the question of what the parties truly intended when the intent is not explicitly and clearly expressed in the words of the contract. *Leikvold v. Valley View Community Hosp.,* 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984); *Ridara Livestock Co. v. Agricultural Prod. Co.,* 61 Ariz. 473, 475, 150 P.2d 761, 762 (1944); 3 A. CORBIN, *supra* § 538.

We conclude, therefore, that absent explicit contractual provision or specific evidence as to intent, the documents cannot as a matter of law be interpreted as an unconditional agreement that the Tower lien is to take first position over Burkons' purchase money lien. Depending on the surrounding facts and circumstances (*see, e.g.,* "unsworn testimony" described by the court of appeals; *Burkons,* 165 Ariz. at 306 n. 5, 798 P.2d at 1315 n. 5; *id.* at 314, 798 P.2d at 1323 (Brooks, J., dissenting)), the agreement may either be interpreted as a matter of law to provide for subordination to a construction loan only, or may be interpreted in light of extrinsic evidence as to the true intent of the parties, including the possibility there was no meeting of the minds on the question of priority. In any case, the trial court erred in granting Ticor summary judgment on the breach of contract claims.

2. *Contractual Duty of an Escrow Agent*

■ Ticor argues, however, that it is not required by law to take into consideration the meaning of the agreement between the

parties but only to do that which it is instructed to do under the escrow agreement. This contention is refuted by the facts of the present case. The purchase contract and the escrow instructions were not intended to be discrete entities. Ticor itself drafted the escrow instructions on the basis of the purchase contract. The escrow instructions do not direct Ticor to record the Tower lien prior to the Burkons lien. Nor do the instructions require Ticor to record the subordination agreement. They do tell Ticor, instead, that Burkons is to have a first lien. It is only by reading all of the documents in escrow that Ticor could determine that the subordination agreement and the letter of intent it incorporated were to be recorded, and it was only by interpreting those documents that Ticor put the purchase money lien in second position to the Tower loan.

Contrary to Ticor's fears, we do not impose on the escrow agent a new duty to review all documents deposited in escrow to determine that those documents are legally correct and effectuate the parties' subjective intentions. We rely instead on the old principle that an escrow agent which fails to follow the escrow instructions breaches its contract, and the parties to the escrow may recover "all damages resulting from any deviation" from the escrow instructions. *Tucson Title Ins. Co. v. D'Ascoli*, 94 Ariz. 230, 234, 383 P.2d 119, 121 (1963). Nor do we believe Arizona law recognizes Ticor's argument that the escrow agent can remain ignorant of the agreements between the parties and need only read the terms of the escrow instructions. The very case cited by Ticor stands for the opposite conclusion. In *Shaheen v. American Title Insurance Co.*, the court held that the documents received in escrow—including the agreements between the parties—give the escrow agent implied authority "and thus an instruction" to act in a certain manner. 120 Ariz. 505, 507, 586 P.2d 1317, 1319 (Ct.App.1978).

■ We believe the true principle is that the escrow agent must be cognizant not only of the escrow instructions but of the provisions contained in the documents that are deposited in escrow. If there is a significant variance between the two, the escrow agent has a remedy. When the terms of the instruments, or any other fact known to the escrow agent, including the documents deposited in escrow, "present an ambiguity of interpretation as to the intention" of the parties, the agent has a "duty to call its principal[s] for clarification." *Gardenhire v. Phoenix Title & Trust Co.*, 11 Ariz.App. 557, 559, 466 P.2d 776, 778 (1970); *Shaheen*, 120 Ariz. at 509, 586 P.2d at 1321 (Eubank, J., dissenting). When the "agent should realize the possibility of conflicting interpretations, ordinarily [it] is not authorized to act, since it would be [its] duty to communicate with the principal[s] and obtain more definite instructions." *Gardenhire*, 11 Ariz.App. at 559, 466 P.2d at 778 (quoting Restatement (Second) of Agency § 44 comment c); *see also Cruikshank v. Horn*, 386 N.W.2d 134, 137–38 (Iowa App.1986).

We conclude therefore, with the court of appeals, that the trial court erred in granting summary judgment on the counts alleging that Ticor breached its contractual obligations by recording the documents in such a manner as to put the Burkons purchase money lien in a subordinate position to the Tower loan. It is at least a question of fact as to whether the parties manifested an intention that the subordination agreement be conditional upon the use of the Tower loan proceeds for development of the property. If so, then the escrow agent was required to carry out that intent. If the facts known to the escrow agent showed the manifested intent was uncertain or ambiguous, the agent was obligated to require clarification before proceeding. Thus, unless it should be determined from the evidence that the parties intended to give the Tower lien unconditional priority, Ticor breached its contractual obligations by giving Tower priority without obtaining clarification before proceeding. In such an event, Ticor would be liable to Burkons for damages for breach of its contractual obligations as an escrow

agent.[6]

## B. The Escrow Agent's Duty to Disclose Fraud

■ Burkons alleged that Ticor breached its implied contractual, fiduciary duty by failing to inform him that the Tower loan was not being used for construction but, rather, to finance the down payment, with the balance apparently going to Pyramid. Acknowledging an escrow agent's obligation to maintain confidentiality with each of the parties to the escrow, Burkons claims nevertheless that when the agent knows a fraud is being perpetrated, it has an obligation to reveal the facts to the parties.

Our law on this issue is based on *Berry v. McLeod,* 124 Ariz. 346, 604 P.2d 610 (1979). McLeod had agreed to sell a parcel of real property to a corporation that, unknown to him, had been formed by his brokers to acquire the property from their client and resell it to another at double the price. The title company established two escrows for the transaction, one for the sale from McLeod to the corporation and the second for the sale between the corporation and the final purchaser. McLeod's personal representative sued the escrow company, claiming it knew of the scheme and failed to inform McLeod that his brokers were making secret profits. *Id.* at 352, 604 P.2d at 616; *see* Note, *Escrowee's Duty to Disclose Fraud: An Expansion of the Limited Agency Doctrine,* 22 ARIZ. L.REV. 1146, 1147 (1980).

McLeod's representative alleged both negligence and breach of fiduciary duty. This court held that though the trial judge should have directed a verdict on the negligence issue, a jury question remained: if the escrow agent knew of the fraud, it would be liable for breach of its fiduciary obligation to disclose a known fraud. *Ber-ry,* 124 Ariz. at 352, 604 P.2d at 616; *see also D'Ascoli,* 94 Ariz. at 234, 383 P.2d at 121–22 (the escrow agent, a fiduciary, must conduct the transaction with "scrupulous honesty, skill and diligence.").

Acknowledging the *Berry* rule, Ticor argues that because there is no evidence it had actual knowledge that a fraud was being committed, the court of appeals impermissibly expanded *Berry* by applying it to this case. In Ticor's view, the court held the escrow agent liable for negligent failure to discover a fraud rather than for failing to disclose a known fraud.

■ Ticor's view of the *Berry* case is too restrictive. *Berry* requires the escrow agent to disclose information when it "knows that a fraud is being committed." *Berry,* 124 Ariz. at 352, 604 P.2d at 616. It does not require the escrow agent to investigate and search for fraud. *Id.* But our reading of *Berry* also leads to the conclusion that it does not permit the escrow agent to close its eyes in the face of known facts and console itself with the thought that no one has yet confessed fraud. Although not required to investigate, when the agent is aware of facts and circumstances that a reasonable escrow agent would perceive "as evidence of fraud," then there is a duty to disclose. Note, *supra,* 22 ARIZ.L.REV. at 1153 (describing *Berry*'s holding). *See American State Bank v. Adkins,* 458 N.W.2d 807, 810–11 (S.D.1990) (following *Berry* rule); PROSSER AND KEETON ON THE LAW OF TORTS § 106, at 738–39 and n. 42 (5th ed. 1984); Keeton, *Fraud–Concealment and Non–Disclosure,* 15 TEX.L.REV. 1, 10 (1936).

Applying this rule, we must determine whether the facts and circumstances known to Ticor could support a finding that a reasonable escrow agent would have perceived them "as evidence of fraud," so that

---

**6.** Under this analysis, we find it unnecessary to distinguish between breach of contract for improper order of recording the documents (the Tower lien first and the Burkons' lien second) and breach for recording the subordination agreement. If it was the manifested intent of the parties that subordination was unconditional, then the escrow agent was correct in giving Tower priority, no matter how this was achieved. If, on the other hand, Ticor breached its contractual obligations by giving Tower unconditional priority, then it makes no difference whether this was accomplished by the order of recording lien documents, by recording the subordination agreement, or both.

there was a duty to disclose. That inquiry is easily answered on the record before us. Certainly the trier of fact would be entitled to consider that no reasonable business purpose was served by Pyramid's scheme, that no reasonable seller would have agreed to it if he had understood it, and that the documents—particularly the letter of intent—were misleading because they implied the funds would be used for construction. The factfinder could conclude that the escrow agent, with all its experience, must have been aware of these circumstances.

There was ample evidence that Ticor was aware of the actual facts of the transaction. Yancy, the escrow officer for all of Pyramid's transactions with Ticor, knew before closing that the combined liens on the property were greater than the purchase price and that the Tower lien was not going to be used for development but instead would be used to finance the down payment, with the rest to be disbursed directly to the buyer. Of course, while one might hope that the buyer would use the disbursement to develop the property, it is highly unusual, to say the least, to disburse development funds directly to the buyer without control.

In fact, Yancy was so concerned about the methods being used that she called the problem to the attention of one of her supervisors. For reasons not shown in this record, the supervisor told her that Ticor's internal policy dealing with over-encumbrancing was inapplicable to the Burkons escrow. It is possible that Ticor's policy was inapplicable, but the record shows nothing to support that statement, especially when this escrow was the third in a series of over-encumbered escrows that Ticor handled for Pyramid and some unfortunate seller.

Most important, Ticor's internal policy raised the flag of suspicion quite high. Ticor had conducted in-house educational programs designed to "make the escrow personnel aware" of a "creative situation that could involve us in a loss because of fraud." Exhibit to Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment, filed Aug. 27, 1986, at L–6, L–14. At an in-service training meeting, Ticor's escrow officers had been warned about "over-encumbered property. This is where buyers are allowed to place a loan on the property which is superior to the sellers' carry back, but allows the buyer enough money to pay the down payment from it and the balance goes into his pocket. The total encumbrances exceed the sales price and company policy is that we will not handle this type of transaction," (*Id.* at L–3), because it is an "outright swindle." *Id.* at L–13. Escrow officers were taught "the use of tactful customer relations skills" in explaining why Ticor did not accept such escrows. *Id.* at L–6. Ticor's documents require its personnel to notify parties to the escrow where there is an over-encumbrance and repeat that Ticor "will not handle an over-encumbered property transaction." *Id.* at L–11, L–13.

Given the foregoing, we must conclude that the trial judge erred in granting summary judgment on the count alleging that Ticor breached its fiduciary duties by failing to notify Burkons that the property was being over-encumbered. It is impossible to say as a matter of law that a reasonable escrow agent would not perceive the over-encumbrance situation as substantial evidence of fraud in light of the internal policies of this very escrow agent. There was strong evidence that the actual facts known to Ticor raised substantial evidence of fraud. Under such circumstances, the principles set forth in *Berry* require the escrow agent to disclose the facts to the parties.

We reject Ticor's suggestion that there is no duty to disclose unless the escrow agent actually knows that a fraud is being perpetrated. Parties perpetrating fraud rarely confess to their escrow agents, and absolute knowledge of fraud can seldom be established. Such a rule is so unrealistic that it would actually make escrow agents reluctant accomplices to land fraud schemes. Because of the principle of confidentiality, the escrow agent would act at its peril in making any disclosure without an actual confession of fraud.

We prefer as a matter of common law policy to rely on *Berry's* point: if the *facts actually known* to the escrow agent present substantial evidence of fraud, there is a duty to disclose.

## C. Tort Damages for Breach of the Implied Covenant of Good Faith and Fair Dealing

█ Burkons argued that the trial court erred in granting Ticor's motion to dismiss the count of the complaint that sought damages for bad faith breach of the escrow contract for failure to state a claim.

We have previously held that the covenant of good faith and fair dealing is legally implied in every contract. *See Rawlings v. Apodaca,* 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986); *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985). Again, the covenant forbids a party to a contract from doing anything denying the right of the other to receive the benefits that flow from the contract. *Rawlings,* 151 Ariz. at 153–54, 726 P.2d at 569–70. Undoubtedly, given the nature of the contractual relationship between an escrow agent and its principal, the covenant of good faith and fair dealing recognizes a fiduciary relationship and requires the escrow agent to act with the utmost honesty and fairness. *D'Ascoli,* 94 Ariz. at 234, 383 P.2d at 121–22.

█ As the court of appeals noted, the remedy for breach of this implied covenant is ordinarily by action on the contract, but in certain circumstances, the breach of the implied covenant may provide the basis for imposing tort damages. *See Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038. These principles are not confined to insurance contracts but apply to contracts in which there is a special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility. *Rawlings,* 151 Ariz. at 158–59, 726

P.2d at 574–75; *Dodge v. Fidelity & Deposit Co.,* 161 Ariz. 344, 346, 778 P.2d 1240, 1242 (1989); *see also Mitsui Mfrs. Bank v. Superior Court,* 212 Cal.App.3d 726, 728–29, 260 Cal.Rptr. 793, 795–96 (1989).

█ Among the special relationships in which such tort damages for breach of contract may be available are those undertaken for something more than or other than commercial advantage, such as the procurement of service, professional help, security, or other intangibles. *Rawlings,* 151 Ariz. at 159, 726 P.2d at 575. Also, the assessment of tort damages for breach of contract is a device most often allowed in situations in which the rule restricting recovery to contract damages would promote breach of the contract rather than its performance. *See Rawlings,* 151 Ariz. at 159–60 and n. 4, 726 P.2d at 575–76 and n. 4; *Mitsui,* 212 Cal.App.3d at 729, 260 Cal. Rptr. at 796.

With these principles in mind, we turn to the facts of this case. Burkons makes no argument, and we can conceive of none, why the traditional contract damage rule would not provide adequate compensation under the facts of this case.[7] The bad faith theory evidently arises from Burkons' contention that Ticor failed to restore his deed of trust to first lien position. At oral argument, Burkons advanced the rationale that the bad faith breach in this case was Ticor's refusal of his request that Ticor acquire and forgive the Tower loan or make an agreement nullifying the subordination. This is equivalent, we believe, to saying that Ticor is liable for tort damages because it failed to pay the contractual damages on demand. We do not believe that the law recognizes the imposition of tort damages on a bad faith theory because a party who breached a contract fails to accede to the other party's demand for payment of contract damages. The situation

7. Compare, for instance, the case where a medical insurer refuses without tenable grounds to approve a $1,000 surgical procedure for its insured, thus preventing the insured from obtaining needed medical treatment and leading to serious disease or death. If all the insurer risks by its groundless refusal to perform its contract is the $1,000 it would have owed in any event, then it is to its advantage to refuse, without grounds, payment of the claim in every instance where the market rate of interest exceeds the legal rate of interest. *See Rawlings,* 151 Ariz. at 159–60 and n. 4, 726 P.2d at 575–76 and n. 4.

might well be different if Ticor had the ability to refuse to consummate the transaction, and had been requested to do so, but nevertheless subordinated Burkons' lien and disbursed the Tower loan in violation of its own internal policies and without reasonable grounds.

In the final analysis, Burkons bargained to sell his property for $135,000, of which $25,000 was to be paid down and the remainder, at interest, over a period of years. Nothing is alleged that would support the conclusion that the contract measure of damages imposed on Ticor, which was not liable on the note at all, is not sufficient to both compensate Burkons and deter escrow agents from breaching their duties.

Whatever the applicability of bad faith breach of contract theory to agreements between an escrow agent and the parties to the escrow, an issue we need not determine now, the facts of this case do not support such a theory. *See Donnelly Constr. Co. v. Oberg,* 139 Ariz. 184, 186, 677 P.2d 1292, 1294 (1984). We conclude therefore that in light of the contentions advanced by Burkons and the facts on this record, the trial judge did not err in dismissing the bad faith count.

D.   Attorney's Fees

■   Finally, Ticor challenges the court of appeals' award of attorney's fees to Burkons. A.R.S. § 12–341.01(A) provides that in "any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney's fees." In *Wagenseller,* we stated that a "successful party" under A.R.S. § 12–341.01 "may include those who achieve reversal of an unfavorable interim order if that order is central to the case and if the appeal process finally determines an issue of law sufficiently significant that the appeal may be considered as a separate unit." 147 Ariz. at 393–94, 710 P.2d at 1048–49 (supplemental opinion). Reversing the trial court's grant of summary judgment, we held that Wagenseller was the successful party. *Id.; see also Bartning v. State Farm Fire & Cas. Co.,* 162 Ariz.

344, 349, 783 P.2d 790, 795 (1989); *Dodge,* 161 Ariz. at 348, 778 P.2d at 1244.

Upon reversing the trial court's grant of summary judgment, the court of appeals found that Burkons was the successful party and granted his request for attorney's fees. *Burkons,* 165 Ariz. at 312, 798 P.2d at 1321 (citing *Dodge* and *Wagenseller* ). Ticor argues that the court of appeals erred in awarding attorney's fees because this is a contingency case in which there has been no recovery as yet. Acknowledging that our decision in *Sparks v. Republic National Life Insurance Co.,* 132 Ariz. 529, 545, 647 P.2d 1127, 1143, *cert. denied,* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982), permits an award of attorney's fees in a contingency case, Ticor nonetheless argues that A.R.S. § 12–341.01(B) precludes the award of attorney's fees in interim proceedings in contingency cases. The statute provides that the award of reasonable attorney's fees "may not exceed the amount paid or agreed to be paid." A.R.S. § 12–341.01(B). In Ticor's view, Burkons agreed to pay attorney's fees only if he succeeds in obtaining actual recovery by way of judgment. If he does not recover anything, the court of appeals' award of attorney's fees would exceed that which he agreed to pay. Ticor contends that an award of attorney's fees in a contingency case under *Sparks* is proper only after an actual recovery has established the client's obligation to pay fees.

Burkons counters that A.R.S. § 12–341.01 makes "no reference to adjudication on the merits as a prerequisite to recovering attorney's fees as a successful party." *Wagenseller,* 147 Ariz. at 392, 710 P.2d at 1047. Burkons contends that denying attorney's fees on appeal to parties whose cases are handled on a contingency basis will discourage litigants from pursuing meritorious appeals because of the risk that they may not ultimately prevail on some or all of the merits of their claims.

We agree with the court of appeals that Burkons was the successful party under A.R.S. § 12–341.01(A) by virtue of obtaining reversal of the trial court's grant of summary judgment and is therefore enti-

tled to attorney's fees on appeal under the principles set forth in *Wagenseller*. We also acknowledge the possibility that an interim award of attorney's fees in contingency cases may exceed the amount agreed to be paid.

Accordingly, we agree with the court of appeals' reversal of the award of attorney's fees to Ticor, as Ticor is no longer the successful party in the substantive matters determined here. In the event judgment is entered for Burkons on remand, the trial court is authorized to determine the amount of attorney's fees to which Burkons is entitled as the successful party on this appeal.[8]

The judgment is therefore reversed, the court of appeals' opinion is vacated, and the case is remanded to the trial court for further proceedings in accordance with this opinion.

CAMERON and MOELLE, JJ., and JOHN M. ROLL, Vice Chief Judge and LAWRENCE HOWARD, Judge, Court of Appeals, concur.

GORDON, C.J., and CORCORAN, J., did not participate in this decision; pursuant to article 6, § 3 of the Arizona Constitution, ROLL, Vice Chief Judge, and HOWARD, Judge, of the Court of Appeals, Division Two, were designated to sit in their stead.

8.  Our disposition makes it unnecessary for us to consider Ticor's assertion that the amount of Burkons' claim for attorney's fees was not properly established in the court of appeals.