50 P.3d 836

**Lee BEAUDRY, William Gruwell, Ray Korte, III, William Mason, Karl Moedl, Tony Komadina, Tom Quebedeaux, and W. Knox Ramsey, Jr., Trustees of the Arizona Automobile Dealer's Association Worker's Compensation Trust, Plaintiffs–Appellants,**

v.

**INSURANCE COMPANY OF THE WEST, a foreign corporation, Defendant–Appellee.**

No. 1 CA–CV 01–0384.

Court of Appeals of Arizona, Division 1, Department D.

May 9, 2002.

As Amended July 26, 2002.

Sacks Tierney P.A. By Mark D. Dillon and James W. Armstrong, Scottsdale, Attorneys for Plaintiffs–Appellants.

Holloway Odegard Sweeney & Evans, P.C. By James W. Evans and Gregorio M. Garcia, Phoenix, Attorneys for Defendant–Appellee.

## OPINION

THOMPSON, Judge.

¶ 1 Appellants, who are trustees of the Arizona Automobile Dealer's Association Worker's Compensation Trust (the Trust), challenge the trial court's grant of summary judgment in favor of appellee Insurance Company of the West (ICW) in this dispute over ICW's decision to decrease the amount of policyholder dividends paid for the 1995–96 policy year. For the following reasons, we reverse the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶2 Beginning in policy year 1986, the Trust arranged for its beneficiaries, Arizona Automobile Dealer's Association (AADA) members, to purchase worker's compensation insurance through the Trust from ICW, with ICW treating the AADA members as a collective group for dividend purposes. After the close of each policy year, ICW calculated and paid "dividends" to the Trust for distribution to its beneficiaries. The dividends were essentially a refund of a portion of the premium paid, and were based roughly on the following formula: Dividends = Premiums—(Losses + Retention), where the "Retention" factor was a percentage of the premium, calculated to allow ICW to recover its costs for overhead and claims processing, plus a reasonable profit. Thus, under the formula, the greater the retention percentage, the lower the dividend paid to the Trust.

¶3 For the policy years 1986 through 1995, the premiums paid, retention percentages, and retention amounts were as follows:

| Year | Premium Paid | Retention Percentage | Retention Amount |
|------|--------------|----------------------|------------------|
| 1986 | $4,173,707 | 27.5% | $1,147,769 |
| 1987 | $4,256,320 | 27.5% | $1,170,488 |
| 1988 | $4,866,124 | 27.8% | $1,350,359 |
| 1989 | $5,296,059 | 27.3% | $1,446,049 |
| 1990 | $6,395,782 | 27.5% | $1,758,840 |
| 1991 | $6,054,805 | 27.5% | $1,665,071 |
| 1992 | $4,981,638 | 28.4% | $1,414,785 |
| 1993 | $5,446,530 | 28.4% | $1,546,815 |
| 1994 | $6,279,399 | 28.4% | $1,783,349 |
| 1995 | $5,557,890 | 28.4% | $1,578,441 |

In June 1996, the Trust decided to provide coverage to its beneficiaries through a different carrier for the 1997 policy year, and therefore did not renew the policy with ICW after the 1996 policy year. Subsequently, in calculating the dividend for the 1996 policy year, ICW applied a retention factor of 43.9%. This resulted in a retention amount of $1,950,011, leading to a dividend that was substantially lower than in prior years, and substantially lower than it would have been if ICW had applied the 28.4% retention rate that the Trust claims should have applied.

¶4 The Trust, through its trustees, sued ICW, alleging that ICW breached its contract with the Trust and acted in bad faith by substantially raising the retention percentage to retaliate for the Trust's decision not to renew its policy with ICW. ICW filed a counterclaim and third-party complaint, alleging defamation and intentional interference with contract.

¶5 The parties filed cross-motions for summary judgment and the Trust filed a motion to dismiss count two of the counterclaim and third-party complaint. The Honorable B. Michael Dann ruled against both parties on their respective complaints, dismissing ICW's defamation and intentional interference with contract claims, and ruling that ICW did not breach the contract with the Trust and did not act in bad faith.[1] Specifically, Judge Dann ruled that the dividend program was discretionary because the "Participating Provisions Endorsement" to the individual policies provided that "The insured may participate in the earnings of the company ... to the extent and upon the conditions determined by the Board of Directors ... after expiration of the policy period to which the dividend is applicable...." Moreover, the court ruled,

Plaintiffs were also informed that the formula for determining their dividend was premised upon and required a minimum of $5,000,000 in premiums paid. One year, when plaintiffs' premiums totaled slightly less than five million dollars, defendant decided to lower the requirement by 5% so plaintiffs could continue to benefit from the same retention rate. For every other year, plaintiffs met the premium requirement. However, for the policy year in question, 1996, plaintiffs' premiums fell more than 10% below the $5,000,000 threshhold. Defendant applied a higher retention rate in plaintiffs' case for 1996, resulting in a proportionately lower premium.

---

1. Some minor issues raised in appellants' motion for summary judgment remained unresolved by the court. The parties, however, apparently resolved these issues, because appellants filed with the trial court a "Motion for the Entry of Judgment," in which they stated that "All issues in the case have been resolved."

. . .

Plaintiffs have failed to carry their burden as there is no evidence from which a jury could reasonably find that defendant determined the premium amount in some unfair, arbitrary or capricious manner. From all that appears, defendant utilized a sliding scale of retention percentages based on the total premium paid and other valid business considerations. Plaintiffs had no protected expectancy that defendant would continue to pay them the same rated dividends regardless of premiums paid.

¶ 6 The case later was transferred to the Honorable Roger W. Kaufman, who denied the Trust's motion for reconsideration, awarded ICW its costs and $20,000 for its attorneys' fees as the prevailing party, and entered final judgment on May 24, 2001. The Trust timely appealed.

## DISCUSSION

### A. Breach of Contract Claim

¶ 7 The Trust contends that the trial court erred in granting ICW's motion for summary judgment on the breach of contract claim. On appeal from a summary judgment, we view the evidence in the light most favorable to the party against whom judgment was entered. *Pioneer Annuity Life Ins. Co. v. Rich,* 179 Ariz. 462, 464, 880 P.2d 682, 684 (App.1994). "[W]e determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in its application of the law." *Gonzalez v. Satrustegui,* 178 Ariz. 92, 97, 870 P.2d 1188, 1193 (App.1993).

¶ 8 Here, the facts are essentially undisputed. There was no formal written agreement between ICW and the Trust setting forth the conditions upon which ICW would pay dividends to the Trust for distribution to the AADA members; yet, both parties agree that this was the procedure that was agreed upon and was followed each policy year. Moreover, the parties agree on the general course of events as outlined above, and agree that a 1987 letter and two "Dividend Declaration Statement" letters (dated 1990 and 1991) were written, received, and read. It is the inferences to be drawn, from these undisputed facts and from the contents of the letters, that are contested.

¶ 9 Thus, although the parties agree that ICW paid dividends for the 1996 policy year, ICW contends that the letters unequivocally establish that it was not obligated to pay dividends at all for the 1996 policy year, much less obligated to pay them based on a specific retention rate, while the Trust contends that the letters, in conjunction with the course of conduct between the parties, unequivocally establish that ICW was obligated to use the 28.4% retention rate in paying those dividends. ICW contends that the letters establish that the 28.4% retention rate applied only to groups whose premiums totaled at least $5 million; the Trust contends that ICW's course of conduct led it to reasonably expect that the 28.4% retention rate applied to the AADA members' policies purchased through the Trust, regardless of the premium levels.

¶ 10 The terms of a contract may be expressly stated or may be inferred from the conduct of the parties. *See Wagenseller v. Scottsdale Mem. Hosp.,* 147 Ariz. 370, 381, 710 P.2d 1025, 1036 (1985). "The general rule is that the determination whether in a particular case a promise should be implied in fact is a question of fact. Where reasonable minds may draw different conclusions or inferences from undisputed evidentiary facts, a question of fact is presented." *Id.* at 383, 710 P.2d at 1038 (citations omitted).

¶ 11 Judge Dann based his conclusion that there was no evidence to support a breach of contract claim on his findings that ICW used a sliding scale of retention percentages based on premiums paid, that ICW informed the Trust that the formula for determining the dividend was based upon a minimum of $5 million in premiums paid, and that the Trust had no reasonable expectation that ICW would continue to pay dividends based on the 28.4% retention rate if the premiums paid were lower than $5 million. In making these findings, however, Judge Dann improperly resolved disputed facts and inferences.

¶ 12 The evidence presented in connection with the cross-motions for summary judgment showed that the "sliding scale"

ICW used was never disclosed to any of ICW's customers; it was an internal document created only to assist ICW's dividends committee in determining the dividend amounts for various customers. Thus, it could not have been part of any contract between the parties. *See Hill–Shafer P'ship v. Chilson Family Trust,* 165 Ariz. 469, 473, 799 P.2d 810, 814 (1990) (parties must mutually consent to all terms of contract).

¶ 13 Additionally, Judge Dann noted that the two "Dividend Disclosure Statements," dated December 1991 and November 1992, stated that "This dividend statement is based on the most recent dividend declaration by our Board of Directors for associations with characteristics similar to yours and a dividend plan premium range of $5 million or more." Judge Dann inferred from these statements that ICW had clearly notified the Trust that it required a minimum premium of $5 million to apply the 27.5% or 28.4% retention rate. Although the statements could support that inference, other evidence in the record supported the inference argued by the Trust, that the $5 million was merely a description, not a mandatory minimum. Specifically, the fact that in four of the years prior to 1996 (1986, 1987, 1988, and 1992), the Trust paid less than $5 million in premiums yet ICW applied the 27.5% or 28.4% retention rate, supports the inference that ICW had agreed to apply the favorable rate regardless of the premiums paid, and that the letters merely described the status of the contract with the Trust at the time the letters were written. Moreover, Judge Dann's finding that there was only one prior year (1992) in which the Trust's premiums fell below $5 million directly contradicts the undisputed evidence.

¶ 14 Finally, the evidence was undisputed that ICW consistently applied a retention rate ranging from 27.3% to 28.4% for ten years, for policy years 1986 through 1995, while the premiums paid during that time period ranged from approximately $4.17 million to approximately $6.4 million.[2] Additionally, when ICW raised the retention rate from 27.5% to 28.4% beginning with the 1992 policy year, it explained *in advance,* in a letter dated December 1991, that the increase in the retention rate was due to a decrease in the premium relative to the established Arizona workers' compensation rates, and that "No other changes are known or anticipated." Certainly this evidence could support a jury finding that the Trust reasonably expected that ICW would apply the 28.4% retention rate to premiums totaling approximately $4.4 million, absent advance notice of a change in the retention rate.

¶ 15 Thus, the documents in evidence and the parties' course of dealing could support (but do not require) a jury finding that an implied term of the agreement between the Trust and ICW was that ICW would pay dividends using the 28.4% retention rate on premiums ranging between $4.17 and $6.4 million. If such a term is part of the contract between the parties, then the jury reasonably could find, based on the evidence presented, that ICW breached the contract by failing to apply the 28.4% retention rate to a $4.4 million premium payment.

■ ¶ 16 ICW contends that any agreement to pay dividends based on a specific retention rate, which was not included in the insurance contracts themselves, would be invalid under Arizona Revised Statutes (A.R.S.) § 20–451(1990).[3] Because ICW has

---

2. In fact, ICW admitted that, for the 1992 policy year, it lowered the otherwise applicable premium requirement solely to allow the Trust to continue to receive the 28.4% retention rate. ICW also admitted that the Trust was its only customer to which the 28.4% rate applied, and that it set that rate especially to benefit the Trust.

3. The statute provides, in relevant part:

No ... insurer ... shall offer, pay, allow or give, directly or indirectly, as an inducement to insurance, or after insurance has been effected, any rebate, discount, abatement, credit or reduction of the premium named in a policy of insurance, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any valuable consideration or inducement whatever, not specified in the policy of insurance, except to the extent provided for in an applicable filing.... Nothing in this section shall be construed as ... prohibiting any insurer from allowing or returning to its participating policyholders, members or subscribers, dividends, savings or unabsorbed premium deposits.
A.R.S. § 20–451.

raised this argument for the first time on appeal, it is waived. *See Cohn v. Indus. Comm'n,* 178 Ariz. 395, 398, 874 P.2d 315, 318 (1994) ("It is well established that issues not presented below should not be considered on appeal."). Further, the express language of A.R.S. § 20–451 does not prohibit dividends.

¶ 17 Therefore, because the documents and other evidence could support conflicting inferences regarding the terms of the parties' agreement, the trial court erred in granting summary judgment to ICW. We remand to the trial court for further proceedings on the breach of contract claim.

## B. Breach of Covenant of Good Faith and Fair Dealing

¶ 18 The Trust contends that, if ICW breached the agreement to pay dividends based on the 28.4% retention rate, the evidence requires a finding that it did so arbitrarily, capriciously, and in bad faith. ICW contends that "no reasonable person could find that ICW acted in bad faith."

The law implies a covenant of good faith and fair dealing in every contract. The duty arises by virtue of a contractual relationship. The essence of that duty is that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship.

*Rawlings v. Apodaca,* 151 Ariz. 149, 153–54, 726 P.2d 565, 569–70 (1986) (citations omitted). "A party may breach an express covenant of a contract without breaching the implied covenant of good faith and fair dealing. Conversely, ... a party may ... breach its duty of good faith without actually breaching an express covenant in the contract." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 491, ¶ 64, 38 P.3d 12, 29 (2002) (citations omitted). In performing pursuant to a contract, if one party "exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain," the law of good faith may provide a remedy. *Southwest Sav. & Loan Assoc. v. SunAmp Sys., Inc.,* 172 Ariz. 553, 558, 838 P.2d 1314, 1319 (App.1992).

¶ 19 In this case, ICW contends that it retained discretion to determine whether to pay dividends as well as discretion to decide how to calculate the amount to pay, after each policy year ended. Indeed, this interpretation is one reasonable inference that could be drawn from the documents in evidence. Nevertheless, such discretion would not be unfettered, but would be constrained by ICW's obligation to exercise its discretion in good faith. *See id.* at 559, 838 P.2d at 1320. Thus, "[t]he question is whether the jury might reasonably have found that [ICW] wrongfully exercised" its power to set the dividends "for a reason beyond the risks" that the Trust assumed in its agreement with ICW, "or for a reason inconsistent with [the Trust's] 'justified expectations.' " *Id.* (citations omitted).

¶ 20 For the reasons stated above, a jury reasonably could conclude that the parties' course of dealing led the Trust to justifiably expect ICW to apply the 28.4% retention rate, whether or not any contract provision, express or implied, required that rate to apply. Moreover, because ICW admitted that, in 1992 (when the Trust had renewed its policy for another year), it changed the premium levels to allow the Trust to benefit from the 28.4% retention rate, a jury reasonably could find that ICW declined to lower the $5 million premium level for policy year 1996 solely because the Trust had not renewed the policy with ICW. Thus, a jury reasonably could find that, even if ICW's payment of dividends or the use of specific retention rates was entirely discretionary, ICW breached the duty of good faith and fair dealing by refusing, for an unfair reason, to pay dividends based upon the 28.4% retention rate that the Trust had come to expect.

¶ 21 This is not, however, the only reasonable inference; the trial court's finding that ICW based its decision on reasonable business interests and objective application of its "Group Retention Scale" is another reasonable inference. Because the inferences to be drawn from the facts conflict, the trial court erred in granting summary judgment on the contract for breach of the covenant of good faith and fair dealing.

¶ 22 The parties next dispute whether tort damages, including punitive damages, are available for breach of the duty of good faith and fair dealing in this case. The general rule is that, "[a]lthough tort damages may be sought where there exists a special relationship between the parties, 'the remedy for breach of this implied covenant is ordinarily by action on the contract.'" *Southwest Sav. & Loan,* 172 Ariz. at 557, 838 P.2d at 1318 (*quoting Burkons v. Ticor Title Ins. Co.,* 168 Ariz. 345, 355, 813 P.2d 710, 720 (1991)); *see also Wells Fargo Bank,* 201 Ariz. at 491, ¶ 64, 38 P.3d at 29 (absent a "special relationship," bad faith claims sound in contract, not tort).

¶ 23 The parties generally agree that an insurer may be a fiduciary, but ICW contends that tort damages are available only where an insurer's fiduciary duties such as claims handling are at stake; otherwise, ICW contends, the Trust is limited to contract damages for any bad faith. The Trust first contends that, because ICW is an insurer, it has a fiduciary duty to its insureds, giving rise to tort liability for *any* breach of the insurance agreement, citing *Dodge v. Fidelity & Deposit Co. of Maryland,* 161 Ariz. 344, 778 P.2d 1240 (1989) and *Rawlings,* 151 Ariz. 149, 726 P.2d 565.

¶ 24 Language in some Arizona cases appears to support the Trust's contention that tort damages should apply to all bad faith claims against insurers. *See, e.g., Dodge,* 161 Ariz. at 345, 778 P.2d at 1241 (stating categorical syllogism that: "Sureties are insurers; insurers are subject to bad faith tort liability; therefore, sureties are subject to bad faith tort liability" is "supported by our statutes, case law, and sound policy reasons."); *Taylor v. State Farm Mut. Auto. Ins. Co.,* 185 Ariz. 174, 177, 913 P.2d 1092, 1095 (1996) ("Because Taylor's injury resulted from ... a breach of State Farm's *implied* duty of good faith—it is more appropriate that Taylor's third-party claim for bad faith failure to settle be governed by the tort statute of limitations."). Closer examination of the rationale for allowing bad faith claims to proceed in tort rather than contract, however, reveals that the rationale is inapplicable to this case.

¶ 25 The supreme court in *Dodge* explained that "[t]he two most important factors" in determining whether a tort action for bad faith will lie "are (1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will 'provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship.'" 161 Ariz. at 346, 778 P.2d at 1242. This is not, however, a case in which an injured insured is awaiting payment of medical expenses, or in which an insured faces potentially devastating liability due to the insurer's bad faith failure to settle a third party's claim within policy limits. *See, e.g., Deese v. State Farm Mut. Auto. Ins. Co.,* 172 Ariz. 504, 838 P.2d 1265 (1992) (tort of bad faith applicable to insurer's refusal to pay medical expenses); *Taylor,* 185 Ariz. at 176, 913 P.2d at 1094 (citing *Farmers Ins. Exch. v. Henderson,* 82 Ariz. 335, 338, 313 P.2d 404, 405–06 (1957), and recognizing tort of bad faith claim based on insurer's failure to settle with third party). Simply put, in the context of an insurer's decision whether to pay dividends on a workers' compensation policy, or how much to pay, the insured employer is not at risk of losing the "contracted for security or protection" from the insured risk of claims by an injured employee. Instead, the employer is at risk of losing, at most, only a potential "profit or commercial advantage" in the form of a refund of a portion of the premium paid. This interest is adequately protected by contract remedies such as a judgment for the amounts wrongfully withheld. Thus, the *Dodge* factors for determining when a fiduciary duty arises do not apply in this case.

¶ 26 The Trust next contends, based upon California cases, that the insurer's payment of dividends under the policy is a fiduciary duty, which allows the Trust to seek tort damages, including punitive damages, for the insurer's bad faith in executing that duty. *See Sec. Officers Serv., Inc. v. State Comp. Ins. Fund,* 17 Cal.App.4th 887, 21 Cal.Rptr.2d 653, 654 (1993) (imposing tort liability for insurer's failure to consider impact on insured's dividends when processing claims and setting reserves); *Mission Ins. Group, Inc.*

*v. Merco Constr. Eng'rs, Inc.*, 147 Cal.App.3d 1059, 195 Cal.Rptr. 781 (1983) (insured can sue under tort theory of bad faith in dispute over amount of dividends due under insurance contract).

¶ 27 The California cases, however, did not consider whether contract damages for breach of the duty of good faith and fair dealing would adequately compensate the insured. Additionally, the plaintiff in *Mission Insurance* had alleged that the insurer engaged in a pattern of unfair practices "to reduce the apparent amount of accumulated surplus and thus to reduce the amount of dividends." *Mission Ins.*, 195 Cal.Rptr. at 787. Thus, the facts indicated that an award of punitive damages might be necessary to vindicate the public policy interests in deterring such conduct.

¶ 28 Here, by contrast, the Trust claims only that ICW unfairly calculated a single dividend pursuant to a single workers' compensation group policy. In this situation, the public policy interests in deterring unlawful conduct and protecting policyholders by allowing a punitive damages claim from unfair dividend practices is attenuated.

¶ 29 Moreover, although the Trust's complaint sought an award of punitive damages, the Trust has not alleged, either in the complaint or in its motions for summary judgment, any basis for an award of punitive damages. A claim for punitive damages requires proof of facts beyond those required to prove bad faith. *See, e.g., Filasky v. Preferred Risk Mut. Ins. Co.*, 152 Ariz. 591, 598, 734 P.2d 76, 83 (1987) (plaintiff "must also show that the evil hand that unjustifiably damaged the objectives sought to be reached by the insurance contract was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured"); *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 498–99, 733 P.2d 1073, 1081–82 (1987) (holding that evidence of insurer's routine practice of unjustifiably reducing amount offered for claims was sufficient evidence of "evil mind" to support claim for punitive damages). The Trust did not provide any evidence of ICW's actual intent to injure the Trust, such as knowledge that the Trust would suffer significant damage if the divi-

dends were not paid, or a pattern or practice of using unfair methods of determining or paying dividends to policyholders. Thus, a breach of contract action will adequately protect the Trust's interests in recovering any dividends that were wrongfully withheld. *Burkons*, 168 Ariz. at 355, 813 P.2d at 720 ("Burkons makes no argument, and we can conceive of none, why the traditional contract damage rule would not provide adequate compensation under the facts of this case.").

¶ 30 We decline to expand the tort of bad faith to cover a situation such as this, where contract damages for breach of the contract or for breach of the implied duty of good faith and fair dealing are adequate to protect the insured's interests.

## C. Attorneys' Fees

¶ 31 The Trust contends that the trial court erred in awarding attorneys' fees to ICW as the prevailing party in a contract action, because the Trust prevailed on the motion for summary judgment regarding the counterclaim and third-party complaint. In light of our reversal of the trial court's judgment in favor of ICW on the contract claims, ICW is no longer the "prevailing party," and we therefore vacate the trial court's award of fees to ICW. The trial court may reconsider whether to award attorneys' fees to either party after further proceedings have resolved the contract claims.

## CONCLUSION

¶ 32 For the foregoing reasons, we reverse the trial court's judgment in favor of ICW on its claims for breach of contract and its claim for contract remedies for breach of the covenant of good faith and fair dealing, and vacate the award of attorneys' fees in favor of ICW. The denial of punitive damage is affirmed. We remand to the trial court for further proceedings consistent with this decision.

CONCURRING: SHELDON H. WEISBERG, Presiding Judge and ANN A. SCOTT TIMMER, Judge.