(text box: 1)(text box: 2)

 IN THE COURT OF APPEALS

 STATE OF ARIZONA

 DIVISION TWO

JULES TRITSCHLER and JANE DOE TRITSCHLER, husband and wife,

Plaintiffs/Appellants,

v.

ALLSTATE INSURANCE COMPANY, an Illinois corporation, and BETTER WAY SERVICES, INC., an Arizona corporation,

Defendants/Appellees.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

2 CA-CV 2005-0136

DEPARTMENT A

O P I N I O N

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20015329

Honorable Jane L. Eikleberry, Judge

Honorable John E. Davis, Judge

AFFIRMED IN PART AND REVERSED IN PART

Joseph C. Dolan

     and 

M. Jay Felix

Steptoe & Johnson, LLP

  By Karl M. Tilleman, Bennett Evan Cooper, and

  John B. Nickerson

Campbell Yost Clare & Norell

  By Stephen C. Yost and Felice F. Guerrieri

Phoenix

Tucson

Attorneys for Plaintiffs/Appellants

Phoenix

Attorneys for Defendant/Appellee

Allstate Insurance Company

Phoenix

Attorneys for Defendant/Appellee

Better Way Services, Inc.

H O W A R D, Presiding Judge.

Appellant Jules Tritschler sued appellee Allstate Insurance Company for breach of contract and bad faith based on its failure to pay a general contractor’s overhead and profit when adjusting a loss, and appellee Better Way Services, Inc., for breach of implied contract concerning its workmanship in repairing Tritschler’s property.  The trial court granted both defendants summary judgment, finding that Allstate was not required to pay overhead and profit and that Tritschler had not been damaged by Better Way’s allegedly substandard work.  We affirm the summary judgment and award of attorney fees in favor of Better Way, but partially reverse the summary judgment in favor of Allstate, finding that a question of fact remains as to whether Allstate can be required to pay overhead and profit under the insurance policy and whether Allstate acted in bad faith in failing to do so. 

In reviewing a ruling on a motion for summary judgment, we view the facts and reasonable inferences from them in the light most favorable to the nonmoving party.  
Link v. Pima County
, 193 Ariz. 336, ¶ 12, 972 P.2d 669, 673 (App. 1998).  In July 1998, rain entered Tritschler’s home, causing damage to portions of his house.  At the time of his loss, Tritschler’s home was insured by Allstate.  Allstate contacted Better Way to perform emergency repairs on the home and told Tritschler that Better Way was in its “Quality Vendor Program” for repair services.  Better Way prepared an estimate of the needed repairs that totaled $44,417.  Included in this estimate were standard ten percent profit and ten percent overhead charges by Better Way.  Tritschler signed a work authorization form allowing Better Way to receive payment of his insurance proceeds from Allstate, and Better Way commenced work on Tritschler’s home.

Better Way worked on Tritschler’s home until October, when Tritschler became dissatisfied with the quality of the work being done.  After Better Way left the job, Tritschler complained to Allstate about Better Way’s workmanship and said he intended to complete the remaining repairs himself.  Allstate offered to allow Tritschler to “cash out” his repair claim, an offer Tritschler accepted.  Allstate paid Better Way $26,210.39, without investigating Tristchler’s claims that Better Way’s work was substandard, and then paid Tritschler $11,568.45.  The amount Allstate paid Tritschler represented the difference between Better Way’s estimated cost of repair and the amount Allstate paid Better Way, but excluded the overhead and profit charges included in the estimate.  Allstate, however, included with its check a note stating: “If you decide to use a general contractor, please submit signed contract or paid bill and [Allstate] will reimburse the contractor overhead and profit.”  

In June 1999, an independent adjuster acting on behalf of Tritschler submitted an actual cash value proof of loss and a demand to Allstate for an additional $36,377 for the “warranty claim” that included $7,967 for general contractor’s overhead and profit fees.  Allstate reimbursed Tritschler $3,757.90, based on a mathematical error in the original calculation, but refused to pay contractor overhead and profit.  Allstate apparently also paid an additional $5,320.35 based on Allstate’s estimate of remaining repairs.  Tritschler subsequently completed the remaining repairs himself, with the help of individual workers. 

Tritschler then sued Better Way and Allstate.  In his complaint, Tritschler alleged Better Way had made substandard repairs to his house, which breached an implied contract to make adequate and workmanlike repairs as well as the implied covenant of good faith and fair dealing.  Tritschler also alleged Allstate had breached its contract by failing to pay him general contractor’s overhead and profit.  He further alleged Allstate had committed acts of bad faith by recommending an incompetent contractor, collaborating with Better Way to make substandard repairs, failing to provide him the benefits of his policy by refusing to obtain the necessary contractor services or pay sufficient proceeds for Tritschler to hire his own contractor, and refusing to pay Tritschler general contractor’s overhead and profit.  Tritschler also sought punitive damages against Allstate.

Shortly thereafter, Allstate served an offer of judgment on Tritschler in the amount of $100,000, which Tritschler declined.  Tritschler later moved for partial summary judgment on his claim that Allstate had breached the insurance contract by failing to pay him general contractor’s overhead and profit.  Allstate responded and filed a cross-motion for partial summary judgment on the overhead and profit issue, the bad faith claim, and Tritschler’s request for punitive damages.  The court granted Allstate’s motion on all grounds.

Better Way moved for summary judgment on the claims against it, and the trial court granted that motion.  Allstate then moved for clarification, arguing that, because the trial court’s grant of summary judgment to Better Way established that Allstate had fully compensated Tritschler for any work Better Way had performed improperly or had not completed, it eliminated any remaining breach of contract claim against Allstate.  Allstate asked the court to clarify that its order granting summary judgment to Allstate disposed of all of Tritschler’s claims against Allstate.  Tritschler likewise moved for reconsideration or clarification on the court’s grant of summary judgment to Allstate, pointing out that Allstate’s motion had only sought partial summary judgment and arguing that it had not addressed all theories of liability Tritschler had alleged in his complaint.  The trial court agreed with Allstate and, finding no genuine issue of material fact to be tried against Allstate, vacated the trial date. In its ensuing judgment, the court awarded attorney fees to Better Way and Allstate.  The court also awarded sanctions to Allstate pursuant to Rule 68, Ariz. R. Civ. P., 16 A.R.S., Pt. 2.

ALLSTATE ISSUES

A.  Breach of contract claim on general contractor overhead and profit

Tritschler first argues that the trial court erred by granting Allstate’s cross-motion for summary judgment and denying his motion on the issue of Allstate’s obligation to include overhead and profit in his insurance reimbursement.  We review the trial court’s grant of summary judgment, which was based on its interpretation of Tritschler’s insurance policy, de novo.  
See Liristis v. Am. Family Mut. Ins. Co.
, 204 Ariz. 140, ¶ 6, 61 P.3d 22, 24 (App. 2002) (propriety of summary judgment reviewed de novo); 
Ariz. Biltmore Estates Ass’n v. Tezak
, 177 Ariz. 447, 448, 868 P.2d 1030, 1031 (App. 1993) (issues of law, including contract interpretation, reviewed de novo).

Tritschler was insured under Allstate’s Deluxe Plus Homeowners Policy.  This policy provides that, in the event of a loss, Allstate has the option of electing either to repair, rebuild, or replace the property itself or to pay the insured for the damaged property.  If Allstate chooses not to repair the property itself, the policy section on payment for a loss states that Allstate will pay for a covered loss by one or more of the following methods:  a) special payment, b) actual cash value, and c) building structure reimbursement.  The special payment provision under subsection (a) applies to losses that are less than $2,500, which both parties agree is not applicable to the present case.  The contract then details the other two methods:

b) Actual Cash Value.  If 
you
 do not repair or replace the damaged, destroyed or stolen property, payment will be on an actual cash value basis.  This means there may be a deduction for depreciation.  Payment will not exceed the limit of liability shown on the Policy Declarations for the coverage that applies to the damaged, destroyed or stolen property, regardless of the number of items involved in the loss.

You
 may make claim for additional payment as described in paragraph “c” . . . if 
you
 repair or replace the damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.

c) Building Structure Reimbursement. . . . 
[W]e 
will make additional payment to reimburse 
you
 for cost in excess of actual cash value if 
you
 repair, rebuild or replace damaged, destroyed or stolen covered property within 180 days of the actual cash value payment.  This additional payment includes the reasonable and necessary expense for treatment or removal and disposal of contaminants, toxins or pollutants as required to complete repair or replacement of that part of a 
building structure(s)
 damaged by a covered loss.  

Building Structure Reimbursement will not exceed the smallest of the following amounts:

1) the replacement cost of the part(s) of the 
building structure(s) 
for equivalent construction for similar use on the same 
residence premises
; or

2) the amount actually and necessarily spent to repair or replace the damaged 
building structure(s) 
with equivalent construction for similar use on the same 
residence premises
; or 

3) the limit of liability applicable to the 
building structure(s) 
as shown on the Policy Declarations . . . regardless of the number of 
building structures 
. . . involved in the loss.

The policy also contains a Standard Fire Policy Provisions attachment, which states, in part, that Allstate “does insure the Insured named in the Declarations and legal representatives, to the extent of the actual cash value of the property at the time of loss . . . against all direct loss by fire, lightning and other perils insured against in this policy.” (Emphasis deleted.)  The Standard Fire Policy Provision limits the actual cash value payment to “the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss.”  And the Arizona Amendatory Endorsement attached to the policy defines “actual cash value” as “the current cost to repair or replace covered property with new material of like kind and quality less a deduction for physical deterioration and depreciation, including obsolescence.”

In his motion for partial summary judgment, Tritschler argued that the actual cash value included the contractor’s overhead and profit, and thus, he was entitled to receive these amounts under subsection (b).  Allstate countered that subsection (b) only applies to those insureds who choose not to repair their properties and that, because Tritschler did repair his property, any payment by Allstate is covered only under subsection (c) for building structure reimbursement.
(footnote: 1)  Allstate further contended that, because Tritschler had repaired the property himself and had not employed a general contractor, he did not actually incur contractor overhead and profit fees.  And, because subsection (c) limits an insured’s reimbursement to “the amount actually and necessarily spent” to repair or replace the damaged property, Allstate argued that Tritschler was not entitled to receive reimbursement for these amounts.  The trial court adopted Allstate’s interpretation of the insurance policy and granted summary judgment on this issue in favor of Allstate.

When interpreting an insurance policy, we construe the policy’s provisions “according to their plain and ordinary meaning.”  
Sparks v. Republic Nat’l Life Ins. Co.
,
 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982).  If, however, a provision may be susceptible to different interpretations, we will attempt to discern its meaning by examining the language of the provision, the purpose of the transaction, and public policy considerations.  
State Farm Mut. Auto. Ins. Co. v. Wilson
, 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989).  “‘[T]he policy must be read as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions.’”  
Sparks
, 132 Ariz. at 536, 647 P.2d at 1134, 
quoting
 
Fed. Ins. Co. v. P.A.T. Homes, Inc
., 113 Ariz. 136, 139, 547 P.2d 1050, 1053 (1976); 
see also
 A.R.S. § 20-1119 (“Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy.”).

Subsection (b) of the policy states that, “if [the insured] do[es] not repair or replace the damaged . . . property,” Allstate will pay the actual cash value of the property. That provision supports Allstate’s position because Tritschler did in fact repair his property.  But subsection (b) further provides that, if the insured elects to repair the damage within 180 days of the date the actual cash value payment is made, the insured “may make a claim for additional payment” under subsection (c).  Subsection (c) then provides that, if the insured chooses to repair the property “within 180 days of the actual cash value payment,” Allstate agrees to reimburse the insured “for cost in excess of actual cash value” associated with repairing or rebuilding the damaged property.  These provisions support Tritschler’s position that subsection (c) provides for a payment additional to subsection (b)’s actual cash value payment.  Therefore, given their plain and ordinary meanings, portions of subsections (b) and (c) could conflict, and thus, the policy provisions concerning actual cash value are ambiguous.  
See
 
Wilson
, 162 Ariz. at 257 n.9, 782 P.2d at 733 n.9.

Nevertheless, reading the policy “‘as a whole in order to give a reasonable and harmonious meaning and effect to all of its provisions,’” 
Sparks
, 132 Ariz. at 536, 647 P.2d at 1134, 
quoting P.A.T. Homes
, 113 Ariz. at 136, 547 P.2d at 1053, we conclude that the Standard Fire Policy Provision clarifies that this policy requires an “actual cash value” payment because it provides that Allstate “does insure the Insured named in the Declarations and legal representatives, to the extent of the actual cash value of the property at the time of loss.”  Although, as Allstate correctly points out, this provision is designed to meet minimum statutory requirements for fire insurance in Arizona,
(footnote: 2) the clear language of this provision extends this coverage to damage caused by “other perils insured against in this policy.” (Emphasis deleted.)  It does not explicitly exclude damage caused by water or heavy rains nor does it attempt to distinguish between insureds who elect to repair their properties and those who do not.  We therefore conclude that, under this policy, absent satisfactory and completed direct repairs by Allstate, all insureds are eligible to receive the actual cash value of the damage sustained to their properties.

Having made this determination, we further conclude an insured is entitled to receive the actual cash value of the damage pursuant to subsection (b) regardless of whether he or she chooses to repair or replace the damaged property.  The second paragraph of subsection (b) provides that “[the insured] may make claim for 
additional payment 
as described in paragraph ‘(c)’ . . . if [the insured] repair[s] or replace[s] the damaged, destroyed or stolen covered property within 180 days of 
the actual cash value payment
.”  (Emphasis added.)  So, if the insured does repair or replace the property within the time limit, and the cost of these repairs exceeds the amount the insured received from the actual cash value payment, then the insured may seek reimbursement for these additional charges under the Building Structure Reimbursement pursuant to subsection (c), so long as the amount of this reimbursement does not exceed either the replacement cost of an equivalent structure, the amount actually spent to repair or replace the damage, or the liability limit of the contract.

Allstate may intend that its Quality Vendor Program implement subsection (c) without regard to subsection (b).
(footnote: 3)  Under that program, Tritschler did not receive an actual cash value payment, but he did not need that payment because Better Way agreed to repair the damaged property and to be paid directly by Allstate.  On the other hand, when Better Way left the job, the Quality Vendor Program was no longer applicable, and any further payment was to be determined by the terms of the policy.  As we have construed the policy, Allstate was obliged to pay the actual cash value of the damaged property.

At oral argument in this court, Allstate argued that Tritschler had never submitted an actual cash value demand.  It apparently relied on the fact that Tritschler’s demand did not provide for depreciation of the structure.  But Tritschler’s demand specifically stated it was an actual cash value demand.  And Allstate could not cite any authority holding that Tritschler was required to include depreciation in the demand, as opposed to allowing Allstate to calculate any depreciation.  More importantly, Allstate admitted at oral argument that Tritschler made his demand before the repair of the structure was completed.  That was in keeping with the policy, which contemplates that an actual cash value demand under subsection (b) will occur before the work occurs, and the building structure reimbursement under subsection (c) will occur after the work is completed.  Therefore, Tritschler’s demand was an actual cash value demand under the policy.

Allstate further asserted at oral argument that the record did not demonstrate that Allstate had not paid overhead and profit.  This argument fails because in its own letters Allstate expressly refused to pay overhead and profit unless and until Tritschler opted to use a licensed contractor for the repairs.
(footnote: 4)
Accordingly, the trial court erred in finding as a matter of law that Tritschler was not entitled to receive the actual cash value under subsection (b) and that his claim was governed solely by subsection (c).  Nevertheless, we may still uphold the trial court’s grant of summary judgment to Allstate on the issue of contractor fees if it is correct for any reason. 
 See Yauch v. S. Pac. Transp. Co.
, 198 Ariz. 394, ¶ 25, 10 P.3d 1181, 1190 (App. 2000).  Because Tritschler is entitled to the actual cash value of the damage, we next address the issue Tritschler raised in his motion for partial summary judgment:  whether the term “actual cash value” in Allstate’s insurance policy includes general contractor overhead and profit when no contractor is used.

The Arizona Amendatory Endorsement attached to the policy defines “actual cash value” as “the current cost to repair or replace covered property with new material of like kind and quality less a deduction for physical deterioration and depreciation, including obsolescence.”  But the policy does not clarify how Allstate calculates the “cost to repair or replace covered property,” nor does it specify whether this value includes contractor overhead and profit fees.  However, in 
Zuckerman v. Transamerica Insurance Co.
, 133 Ariz. 139, 141, 650 P.2d 441, 443 (1982), our supreme court commented on an insurer’s argument that the insured must first “incur” overhead and profit expenses before the insurer is obligated to pay for such expenses:

Because Zuckerman did not intend to use the insurance proceeds to rebuild, the company took the position that the policy permitted it to reduce the settlement to “actual cash value,” subject to a depreciation factor and excluding contractor’s overhead and profit, sales tax, building permit fees and like items.

The court continued:

The company’s position is dubious on this point.  The policy contains no clause permitting such deductions from the amount of the loss.  It does provide that the company “does insure” Zuckerman to the “extent of the actual cash value of the property . . . , but not exceeding the amount which it would cost to repair or replace the property.”  . . . This is hardly equivalent to a provision that the insured must use the loss payment proceeds for the purpose of rebuilding.

Id
. at 141 n.2, 650 P.2d at 443 n.2 (emphasis deleted).  But, as Allstate correctly notes and Tritschler concedes, this statement in 
Zuckerman
 is dictum and cannot be considered as binding judicial precedent.  
See Creach v. Angulo
, 186 Ariz. 548, 552, 925 P.2d 689, 693 (App. 1996).  And, because no other Arizona court has directly addressed the issue of whether actual cash value includes contractor overhead and profit, we look for guidance to other jurisdictions that have addressed this issue.  
See Hull v. DaimlerChrysler Corp.
, 209 Ariz. 256, ¶ 10, 99 P.3d 1026, 1028 (App. 2004) (finding cases from other jurisdictions persuasive in resolving matter of first impression in Arizona courts).

In
 Snellen v
. 
State Farm Fire & Casualty Co.
, 675 F. Supp. 1064 (W.D. Ky. 1987), the insured had a replacement cost policy, but had the option of receiving instead the actual cash value of the property and possibly reimbursement, within limitations, for additional expenses if the insured later repaired or replaced the property.
(footnote: 5)  
Id
. at 1066.  In that case, the district court considered the issue of whether an insured who elects not to repair the property and accepts the actual cash value under the policy is entitled to payment for contractor overhead and profit.  
Id.
  In deciding that the insured was not entitled to receive these amounts in the actual cash value payment, the court reasoned, without further analysis, that “since the goal is to arrive at the actual cash value of the damage, non-damage factors which are applicable only in the instance of repair or replacement such as clean up, profit, overhead, and permits, were properly deducted.”  
Id
. at 1068.  This case supports Allstate’s position. 

In
 Gilderman v. State Farm Insurance Co.
, 649 A.2d 941 (Pa. Super. Ct. 1994), the insured had a replacement cost policy, but was to receive actual cash value before any repairs or replacement.  The policy limited recovery to the amount actually incurred in repairing or replacing the damaged property.  
Id
. at 942-43.  In that case, a Pennsylvania appellate court considered whether State Farm could deduct contractor overhead and profit from its repair or replacement estimate and offer the insureds an advance check for this lower amount as a payment of actual cash value.  
Id.
 at 944.  In its analysis, the 
Gilderman
 court acknowledged that certain types of property damage may be relatively minor and may not require a general contractor to manage the repairs and that, in such cases, “contractor expenses would not have to be included in repair or replacement costs estimates.”  
Id
. at 945. 

But the court also noted that “there are types of property damage where a homeowner would use the services of a general contractor[,] . . . especially where there is extensive damage to a home requiring the use of more than one trade specialist.”  
Id
.  The court found that, in these instances, an insurance company may not deduct contractor fees from the actual cash value when such fees are reasonably expected to occur.  
Id
.  And the court extended this rationale to instances when the insured might not actually incur labor costs, 
i.e.
, when the insured makes his or her own repairs to a covered loss.  
See id
.  Thus, in contrast to 
Snellen
, the 
Gilderman
 court found State Farm’s automatic deduction of contractor fees improper, holding that “repair or replacement costs include any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss,” even if the insured may never make the repairs.  
Id
.

In
 Salesin v. State Farm Fire & Casualty Co.
, 581 N.W.2d 781, 783-84 (Mich. Ct. App. 1998), the insured also had a replacement cost policy, but elected to recover damages for a loss pursuant to an actual cash value option.  In that case, a Michigan appellate court considered the propriety of State Farm’s routine practice of deducting contractor overhead and profit fees from the actual cash value it paid its insureds.  
Id.
  After considering the rulings of both 
Snellen
 and 
Gilderman
, the court found the reasoning in 
Gilderman
 more persuasive.  581 N.W.2d at 791-92.  In its analysis, the court reasoned that, because the actual cash value is an estimate of all costs that will likely and reasonably be incurred in repairing or replacing the damaged property, the expense of a general contractor cannot be deducted from this estimate unless such services are not likely to be required.  
Id
. at 791.  The court further noted that the fact the insured had made his own repairs and, thus, did not actually incur any contractor fees, did not affect its holding.  
Id
.  Relying on 
Gilderman
, the 
Salesin
 court upheld the trial court’s ruling that State Farm’s practice of automatically deducting contractor overhead and profit from the actual cash value payment was improper.  581 N.W.2d at 791, 793.  

Several other jurisdictions have since followed the reasoning in 
Gilderman
 and 
Salesin
 and ruled that an insurer may not automatically deduct a contractor’s overhead and profit from an actual cash value payment.  For example, in 
Mazzocki v. State Farm Fire & Casualty Corp.
, 766 N.Y.S.2d 719, 722 (App. Div. 2003), which addressed a replacement cost policy, a New York court held that the insurer was “obligated to include profit and overhead in . . . actual cash value, whenever a general contractor would likely be needed.”  Similarly, in 
Ghoman v. New Hampshire Insurance Co.
, 159 F. Supp. 2d 928 (N.D. Tex. 2001), the insured had a replacement cost policy, but made a claim under its actual cash value provision.  
Id.
 at 933.  There, the court found that contractor’s overhead and profit fees clearly constituted “‘any cost that an insured is reasonably likely to incur in repairing or replacing a covered loss’” and, thus, should be included in the actual cash value payment.  
Id
. at 934, 
quoting Salesin
, 581 N.W.2d at 790.  Other courts have followed this reasoning in similar circumstances.  
See Bankers Sec. Ins. Co. v. Brady
, 765 So. 2d 870, 872 (Fla. Dist. Ct. App. 2000) (stating in dictum that, because insurer paid insured prior to repair or replacement, insurer was not authorized to withhold overhead and profit); 
Weidman v. Erie Ins. Group
, 745 N.E.2d 292, 298 (Ind. Ct. App. 2001) (actual cash value of loss set by appraisal, and insurance policy had no provision authorizing insurer to later withhold contractor fees when insured completed own repairs).
(footnote: 6)
In attempting to discern the meaning of the policy, we also look to the purpose of the transaction and public policy considerations.  
Wilson
, 162 Ariz. at 257, 782 P.2d at 733.  Here, the purpose of the transaction was to fully reimburse Tritschler for covered losses, to the extent of the coverage provided by the policy.  
See Rawlings v. Apodaca
, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986) (“[I]n buying insurance an insured . . . seeks protection and security from economic catastrophe.”).  Requiring payment of overhead and profit likely to be incurred if the damage is repaired furthers that purpose.

As a public policy consideration, Allstate argues that such a result would overcompensate insureds who choose to repair their own properties, which would generate a windfall for those insureds and violate the principles of indemnity.  But Allstate agreed to pay Tritschler the actual cash value of the damaged property and accepted premiums based on that agreement.  The actual cash value is an 
estimate
 of the needed repairs; the determination of actual cash value is not based upon what the insured actually pays to repair or replace the damaged property.  Therefore, the amount an insured ultimately spends to make needed repairs, 
if any
, is irrelevant.  
See Salesin
, 
581 N.W.2d at 791; 
see also Ghoman
, 159 F. Supp. 2d at 935.
(footnote: 7)  Furthermore, regardless of whether an insured hires a general contractor or completes his or her own repairs, the insured would still be entitled to what was contracted for in the insurance policy:  the actual cash value of the loss, which may include a contractor’s overhead and profit when a contractor would reasonably be used to make repairs.  
See Ghoman
, 159 F. Supp. 2d at 935; 
Gilderman
, 649 A.2d at 946.  We cannot conclude that requiring an insurer to satisfy its obligations under an insurance contract violates indemnity principles.

Based on the foregoing analysis, we hold that under this policy actual cash value in adjusting a property loss includes any cost that an insured would be reasonably likely to incur in repairing or replacing a covered loss, regardless of whether the insured intends to repair or replace the property.  And, if the cost to repair or replace the damaged property would likely require the services of a general contractor, the contractor’s overhead and profit fees should be included in determining actual cash value, even when an insured ultimately elects to complete personally the needed repairs.

Tritschler contends we should determine that he is entitled to overhead and profit on his claim.  Based on our holding above, we next consider
 if an issue of fact exists on whether Tritschler’s repairs would likely have required the use of a general contractor, which would require Allstate to include contractor fees in the actual cash value payment.  
See
 Ariz. R. Civ. P. 56(c), 16 A.R.S., Pt. 2.  Better Way’s initial estimate for structural repairs to Tritschler’s house was twenty-seven pages long and detailed nineteen areas of the house that needed repairs.  This estimate also listed twenty-one “categories” of repairs, which appear to describe various subspecialties in the construction field.  And, at his deposition, Tritschler testified he had coordinated the work of at least five different tradespeople in completing the repairs to his house.  Furthermore, Allstate never challenged the need to use a general contractor in this instance and, instead, offered to reimburse Tritschler the general contractor fees if he chose to hire one.

Nevertheless, the parties did not focus in their motions for summary judgment on whether a general contractor would have been necessary to complete the remaining repairs.  Much of the evidence we have reviewed was presented in support of other motions before the court.  Rather than rule on this matter based on this limited evidence, we remand this issue to the trial court so it may consider this matter after each party has had the opportunity to conduct discovery and present evidence on this precise issue.
  Cf. Rhoads v. Harvey Publ’ns, Inc.
, 131 Ariz. 267, 269, 640 P.2d 198, 200 (App. 1981) (affirming summary judgment on new grounds “may deprive the non-moving party of the opportunity to present facts which are relevant to the new issues, but which were not relevant to the issues raised below”).

B.  Summary judgment on bad faith claim

Tritschler also challenges the trial court’s grant of summary judgment on his bad faith claim, arguing that Allstate acted in bad faith by refusing to pay overhead and profit.  We review de novo a trial court’s grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party.  
Emmett McLoughlin Realty, Inc. v. Pima County
,
 
212 Ariz. 351, ¶ 2, 132 P.3d 290, 292 (App. 2006).

The tort of bad faith arises when an insurance company intentionally denies coverage or delays or fails to fully pay a claim without a reasonable basis for doing so.  
Noble v. Nat’l Am. Life Ins. Co.
, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981).  To prove a claim of bad faith, a plaintiff must show “1) that the insurer acted unreasonably toward its insured, and 2) that the insurer acted knowing that it was acting unreasonably or acted with such reckless disregard that such knowledge may be imputed to it.”  
Trus Joist Corp. v. Safeco Ins. Co. of Am.
, 153 Ariz. 95, 104, 735 P.2d 125, 134 (App. 1986) (emphases deleted).  An insurer may defend a fairly debatable claim, but in doing so, it must exercise reasonable care and good faith.  
Zilisch v. State Farm Mut. Auto. Ins. Co.
, 196 Ariz. 234, ¶ 19, 995 P.2d 276, 279 (2000).  An insurer’s belief in fair debatability is generally a question of fact for the jury.  
Id.
 ¶ 20.

Tritschler suggests a jury could find that Allstate’s actions were unreasonable because it failed to properly investigate and handle his claim.  In support of this argument, Tritschler notes that his independent adjuster had inquired of Allstate’s adjuster:  “[H]ow does Allstate legally justify withholding overhead and profit from the insureds?”  Tritschler then observes that Allstate’s adjuster passed this question to his supervisor and assumed that his supervisor would seek legal advice to answer it.  However, according to the deposition testimony Tritschler presented, no legal opinion was ever sought nor did Allstate’s adjuster or his supervisor follow up on or respond to the independent adjuster’s inquiry.

Allstate does not contest these facts, but instead, argues that, given the unsettled nature of the law in Arizona surrounding this issue, its decision to withhold contractor fees was “fairly debatable” and, thus, not unreasonable.  
See
 
Zilisch
,
 
196 Ariz. 234, ¶ 19, 995 P.2d at 279.  But before Allstate made its decision to withhold contractor fees from the payment to Tritschler, our supreme court in 
Zuckerman v. Transamerica Insurance Co.
, 133 Ariz. 139, 141, 650 P.2d 441, 443 (1982), although in dictum, had cast doubt on the practice of withholding overhead and profit.  Thus, a jury could find that, by failing to obtain a legal opinion on this issue or to pay overhead and profit, Allstate knowingly acted unreasonably toward Tritschler.  Viewing the facts in the light most favorable to Tritschler, 
see Emmett McLoughlin
, 212 Ariz. 351, ¶ 2, 132 P.3d at 292, we cannot say as a matter of law that a jury could not find bad faith in the processing of Tritschler’s claim.  We therefore remand this issue to the trial court for further proceedings.

At oral argument, Allstate claimed that 
Beaudry v. Insurance Co. of the West
, 203 Ariz. 86, 50 P.3d 836 (App. 2002), precludes Tritschler’s bad faith claim.  In 
Beaudry
, this court noted that the supreme court in 
Dodge v. Fidelity & Deposit Co. of Maryland
, 161 Ariz. 344, 778 P.2d 1240 (1989), had identified the “‘two most important factors’” in determining whether a tort action for bad faith will lie:  “‘(1) whether the plaintiff contracted for security or protection rather than for profit or commercial advantage, and (2) whether permitting tort damages will “provide a substantial deterrence against breach by the party who derives a commercial benefit from the relationship.”’”  
Beaudry
, 203 Ariz. 86, ¶ 25, 50 P.3d at 842, 
quoting Dodge
, 161 Ariz. at 346, 778 P.2d at 1242 (citation omitted in 
Beaudry
).  Under the facts in 
Beaudry
, Division One of this court held that contract damages for breach of the implied covenant of good faith and fair dealing would adequately protect the insured.  
Id. ¶ 
30.  But, in this case, Tritschler has alleged sufficient facts from which a jury could conclude that he had contracted for security and protection and that Allstate had violated that contract with respect to Tritschler’s claim for overhead and profit.

Allstate also contended at oral argument that Tritschler’s complaint does not sufficiently state the grounds, other than Allstate’s refusal to pay overhead and profit, for his bad faith claim.  But, in Arizona, “a complaint need only have ‘a statement of the ground upon which the court’s jurisdiction depends, a statement of the claim showing that the pleader is entitled to relief and a demand for judgment.’”  
Rowland v. Kellogg Brown
 
& Root, Inc.
, 210 Ariz. 530, ¶ 10, 115 P.3d 124, 127 (App. 2005), 
quoting Morn v. City of Phoenix
, 152 Ariz. 164, 166, 730 P.2d 873, 875 (App. 1986).  Tritschler was not required to include in his pleading every nuance or detail of his bad faith claim, and his complaint is sufficient to put Allstate on notice of the bad faith claim against it.

In his complaint, Tritschler alleged that Allstate had committed other acts of bad faith by recommending an incompetent contractor, collaborating with Better Way to make substandard repairs, failing to provide him the benefits of his policy by refusing to obtain the necessary contractor services or pay sufficient proceeds for him to hire his own contractor, and refusing to pay Tritschler general contractor’s overhead and profit.  Tritschler argues that Allstate also committed acts of bad faith when it 1) jeopardized his security under the policy by not explaining to him the warranty program under the Quality Vendor Program, 2) failed to treat him with equal consideration, and 3) refused to honor its obligations under the law after he made an “election to repair” the property under the insurance policy.  Based on our review of the record, we are uncertain whether the trial court granted summary judgment, which originated in Allstate’s motion for partial summary judgment, on some of these issues based on their merits or on Tritschler’s failure to properly allege them or based on the court’s decision concerning overhead and profit, which we have reversed.  Therefore, in our discretion, we reverse summary judgment on all the bad faith claims.  However, our decision does not preclude Allstate from filing further motions for summary judgment on any bad faith issues other than the overhead and profit issue.

C.  Punitive damages

Tritschler also claims the trial court erred by granting summary judgment to Allstate on his claim for punitive damages.  A claim for punitive damages requires proof of facts beyond those required to prove bad faith; to recover punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant’s conduct was undertaken with “an evil mind.”  
Linthicum v. Nationwide Life Ins. Co.
, 150 Ariz. 326, 331, 332, 723 P.2d 675, 680, 681 (1986).  An evil mind can be found either when the defendant intended to injure the plaintiff or when the defendant “consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.”  
Rawlings v. Apodaca
, 151 Ariz. 149, 162, 726 P.2d 565, 578 (1986).  This standard is met by evidence of a defendant’s “conscious and deliberate disregard of the interests and rights of others.”  
Gurule v. Ill. Mut. Life & Cas. Co.
, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987). 

In opposing Allstate’s summary judgment motion, Tritschler did not produce any evidence that Allstate had exhibited the requisite evil mind and intent to harm his interests; instead, he simply argued that the record “demonstrates a pattern of misconduct and disregard of the rights of the insured” and that “the jury could certainly agree that Allstate knew that it was acting in such a way so as to impair the rights which [Tritschler] was supposed to enjoy under th[e] policy.”  This argument is insufficient to support a claim for punitive damages.  
See Gurule; Rawlings; see also Thompson v. Better-Bilt Aluminum Prods. Co
., 171 Ariz. 550, 558, 832 P.2d 203, 211 (1992) (motion for summary judgment on punitive damages should be granted “if no reasonable jury could find the requisite evil mind by clear and convincing evidence”).  

Furthermore, the record shows that Allstate agreed to pay Better Way the actual cash value, including its overhead and profit, to repair Tritschler’s damaged  property.  And Allstate paid Tritschler the amount remaining on Better Way’s estimate after Tritscher terminated Better Way, less overhead and profit, and agreed to pay overhead and profit if he hired a general contractor.  On the record before us, Tritschler has not pointed to any facts from which a reasonable jury could conclude that Allstate acted with an evil mind or that it intended to injure Tritschler or knowingly created a substantial risk of harm to him.  
See Rawlings
, 151 Ariz. at 162, 726 P.2d at 578.  We therefore affirm the trial court’s grant of summary judgment in favor of Allstate on this issue.

D.  Allstate’s protective order and Tritschler’s motion to compel

Tritschler further argues the trial court erred in denying his motion to compel discovery and granting Allstate’s request for a protective order prohibiting Tritschler from issuing subpoenas pursuant to his notices of deposition under Rule 30(b)(6), Ariz. R. Civ. P., 16 A.R.S., Pt. 1.  A trial court has broad discretion in ruling on discovery issues, and we will not disturb its ruling absent a clear abuse of discretion.  
Perguson v. Tamis
, 188 Ariz. 425, 427, 937 P.2d 347, 349 (App. 1996).  A court abuses its discretion if it commits legal error in reaching a discretionary conclusion, or if the record lacks substantial evidence to support its ruling.  
Id
.

Tritschler served a Rule 30(b)(6) request on Allstate specifying sixty-four areas of inquiry.  Allstate objected to several of these areas and moved for a protective order limiting the scope of Tritschler’s request.  Tritschler opposed the motion and filed a cross-motion to compel production of the requested information.  After a hearing on the matter, the trial court granted Allstate’s motion for a protective order as to all but one of the areas it had objected to and correspondingly denied Tritschler’s motion to compel discovery on those same issues.  In ruling as it did, the trial court found the requested depositions related to these issues were “not reasonably calculated to lead to the discovery of admissible evidence and [were] unduly burdensome.”

On appeal, Tritschler challenges the court’s ruling as to three of these issues:  1) whether Allstate had “similar practices” in other jurisdictions on overhead and profit and use of a Quality Vendor Program; 2) whether Allstate’s homeowners insurance policies in other jurisdictions had similar language on payments of actual cash value; and 3) judicial and administrative rulings from other jurisdictions on overhead and profit, election to repair, and use of the Quality Vendor Program.  Tritschler argues these issues were significant to his bad faith claim against Allstate “to explore Allstate’s ‘state of mind’ with regard to its knowledge that its practices are improper,” contending the information from other jurisdictions is relevant to show Allstate knew its practices were unreasonable.

But the trial court could have found that the relevance of policies and insurance decisions from other jurisdictions was limited because insurance laws vary from state to state.  Thus, the practices in other jurisdictions and any legal challenges to such practices do not, as a matter of law, bear on the propriety of those practices in Arizona.  
See 
15 U.S.C. § 1012(a) (“The business of insurance . . . shall be subject to the laws of the several States which relate to the regulation or taxation of such business.”);
 F.T.C. v. Travelers Health Ass’n
, 362 U.S. 293, 300, 80 S. Ct. 717, 721 (1960) (“[I]t is clear that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated.”); 
see also Montoya Lopez v. Allstate Ins. Co.
, 282 F. Supp. 2d 1095, 1104 (D. Ariz. 2003) (reports conducted by other states’ insurance departments to determine insurer’s compliance with state regulatory law not relevant in determining whether insurer liable for bad faith).

Furthermore, in order to comply with Tritschler’s request on this issue, Allstate would have to conduct a nationwide search of all pending and past litigation, published and unpublished court decisions, and regulatory determinations relating to the company’s calculation of overhead and profit.  Such action is unduly burdensome in light of the limited relevance of the information this discovery might ultimately reveal.  
See State Farm Mut. Auto. Ins. Co. v. Superior Court
, 167 Ariz. 135, 139, 804 P.2d 1323, 1327 (App. 1991) (plaintiff’s discovery request for nationwide material to support claim that insurer had acted in bad faith overbroad and unduly burdensome when relevance of information requested questionable).  We therefore cannot find that the trial court abused its discretion in denying Tritschler’s burdensome and overbroad motion to compel discovery and granting Allstate’s motion for a protective order on these issues.

E.  Motion for clarification, sanctions, and attorney fees

Tritschler further argues the trial court erred when it granted Allstate’s motion for clarification.  And he challenges the court’s decision to award Allstate sanctions pursuant to Rule 68, Ariz. R. Civ. P., 16 A.R.S., Pt. 2, and attorney fees pursuant to A.R.S. § 12-341.01(A).  
In its minute entry ruling on the summary judgment motions, the trial court determined as a matter of law that Allstate had not breached its contract with Tritschler and had not acted in bad faith.  After the trial court granted summary judgment in favor of Better Way, Allstate moved for clarification, arguing that the court’s grant of summary judgment to Better Way had eliminated any remaining claims against Allstate.  Based in large part on its initial summary judgment ruling, the court granted Allstate’s motion for clarification and dismissed Tritschler’s claims against Allstate in their entirety.  The trial court subsequently awarded Allstate $24,867.50 in sanctions and $15,000 in attorney fees. 

We have now found the court’s initial ruling on Tritschler’s breach of contract and bad faith claims erroneous.  Therefore, the court’s ruling on the motion for clarification is vacated.  Even though the court granted summary judgment to Better Way, this ruling, without more, is not dispositive of the issues concerning Allstate.  And, because we have reversed the court’s grant of summary judgment on the breach of contract and bad faith claims, Allstate is no longer the successful party.  Therefore, the Rule 68 sanctions and award of attorney fees are also vacated.  

BETTER WAY
 
ISSUES

A.  Summary judgment

Tritschler challenges the trial court’s grant of summary judgment to Better Way Services, arguing that evidence existed that precluded summary judgment.  When reviewing a trial court’s entry of summary judgment, we determine de novo whether any genuine issues of material fact exist and whether the trial court erred in its application of the law.  
Bothell v. Two Point Acres, Inc.
, 192 Ariz. 313, ¶ 8, 965 P.2d 47, 50 (App. 1998); 
see also
 Ariz. R. Civ. P. 56(c), 16 A.R.S., Pt. 2.  A motion for summary judgment should be granted “if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.”  
Orme Sch. v. Reeves
, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990).

In its motion for summary judgment, Better Way argued in part that, because Allstate had paid Tritschler for the repairs he had made to his house, he had failed to produce evidence that he had sustained any damages from Better Way’s allegedly substandard work.  In support of this argument, Better Way claimed in its statement of facts that “Plaintiff admits the only damages remaining to him are for overhead and profit by function of his Statement of Facts.”

In his opposition to Better Way’s motion, Tritschler argued “[t]he disclosure statements herein have always set forth that plaintiff’s claim for damages against Better Way is for in excess of $40,000.00 as set forth in the Anthony Schnarsky testimony.”  Tritschler’s citation to the record on this point was paragraph 447 in his initial statement of facts, which states “Mr. Schnarsky’s estimate of repair on the Tritschler residence is attached hereto as Exhibit 13.”  Exhibit 13, in turn, is an eleven-page spreadsheet printout compiled by Schnarsky of what appears to be a list of repairs completed on Tritschler’s house.  At the bottom of the tenth page, in small print, is the phrase:  “Total of all tabulated cost differences:  $37,891.”

In considering Better Way’s motion, the trial court traced Tritschler’s citations in his statements of fact to Exhibit 13, which the court found “not terribly enlightening.”  The court also observed that “[a]t no point do[es Tritschler] deny Better Way’s claim that [he has] been compensated by Allstate for work allegedly not completed by Better Way or performed improperly by Better Way.  Nor [has Tritschler] submitted any evidence to support a denial that these damages have been paid by Allstate.”  Finding that Tritschler had failed to present adequate evidence to defeat Better Way’s argument that Allstate had compensated him for all damages allegedly caused by Better Way, the trial court granted summary judgment in favor of Better Way.

After reviewing the evidence Tritschler presented in opposing Better Way’s motion for summary judgment, we agree with the trial court that Tritschler failed to meet his burden under Rule 56(c), Ariz. R. Civ. P.  Tritschler failed to present any direct evidence that he had been damaged by Better Way’s allegedly substandard work in an amount not covered by Allstate’s payments.  Instead, his opposition made a convoluted reference to Exhibit 13, which is uninformative on whether Tritschler incurred damages from Better Way’s allegedly substandard work.  Because Tritschler did not present sufficient evidence to create a genuine issue of material fact on damages he had allegedly sustained from Better Way’s work, we affirm the trial court’s grant of summary judgment in favor of Better Way.

B.  Attorney fees

After the court granted summary judgment in its favor, Better Way asked for attorney fees pursuant to either A.R.S. §§ 12-341.01(A) or 12-349.  In the judgment, the trial court awarded Better Way attorney fees pursuant to § 12-341.01.

Tritschler first argues the trial court erred as a matter of law when it awarded attorney fees to Better Way, contending his claim against Better Way did not “arise out of contract” but involved an implied contract.  Without directly citing the statute, he appears to challenge the court’s legal authority to award attorney fees pursuant to § 12-341.01(A) when a claim arises from an implied contract.  We review this issue of law de novo.  
See Chaurasia v. Gen. Motors Corp.
, 212 Ariz. 18, ¶ 24, 126 P.3d 165, 173 (App. 2006).

Section 12-341.01(A) provides: “In any contested action arising out of a contract, 
express or implied
, the court may award the successful party reasonable attorney fees.”  (Emphasis added.)  Therefore, the plain language of this statute grants a trial court authority to award attorney fees in a claim arising out of an implied contract.  Furthermore, in 
Barmat v. John & Jane Doe Partners A-D
, 155 Ariz. 519, 523, 747 P.2d 1218, 1222 (1987) (emphasis added), our supreme court clarified that, “[w]here . . . the duty breached is not imposed by law, but is a duty created by the contractual relationship, and would not exist ‘but for’ the contract, then breach of either express covenants 
or those necessarily implied from them 
sounds in contract.”  
See also Morris v. Achen Constr. Co.
, 155 Ariz. 512, 514, 747 P.2d 1211, 1213 (1987).  Accordingly, we find Tritschler’s argument on this issue without merit and affirm the attorney fee award to Better Way under § 12-341.01(A).

Tritschler also argues the facts of this case do not support an award of attorney fees under § 12-349.  But the court awarded attorney fees under § 12-341.01 and not under § 12-349.  More importantly, we have already affirmed the award of attorney fees under § 12-341.01(A); therefore, we need not consider Tritschler’s argument under any other statute.  
See Uyleman v. D.S. Rentco
, 194 Ariz. 300, ¶ 27, 981 P.2d 1081, 1086 (App. 1999) (decision to award prevailing party attorney fees will be affirmed if it has any reasonable basis).  

DISPOSITION

We affirm the trial court’s judgment in favor of Better Way and award Better Way reasonable attorney fees on appeal pursuant to § 12-341.01(A), upon its compliance with Rule 21, Ariz. R. Civ. App. P., 17B A.R.S.  We also affirm the court’s grant of summary judgment in favor of Allstate on Tritschler’s claim for punitive damages.  We reverse the trial court’s grant of summary judgment in favor of Allstate on Tritschler’s breach of contract and bad faith claims and remand the case to the trial court for further proceedings consistent with this decision.  And, because we reverse the trial court’s grant of summary judgment on these issues, Tritschler is a “successful party” in this appeal under § 12-341.01(A).  
See Wagenseller v. Scottsdale Mem. Hosp.
, 147 Ariz. 370, 393-94, 710 P.2d 1025, 1048-49 (1985) (“successful party” on appeal includes party who achieves reversal of unfavorable interim order when order is central to case and issue of law decided on appeal is “sufficiently significant that the appeal may be considered as a separate unit”).  We therefore vacate the court’s award of sanctions and attorney fees to Allstate and, in turn, grant Tritschler’s request for attorney fees on appeal against Allstate under § 12-341.01(A), upon his compliance with Rule 21, Ariz. R. Civ. App. P.

____________________________________

JOSEPH W. HOWARD, Presiding Judge

CONCURRING:

____________________________________

JOHN PELANDER, Chief Judge

____________________________________

GARYE L. VÁSQUEZ, Judge 

 

FOOTNOTES
1:
At oral argument in this court, Allstate apparently contended that subsections (b) and (c) work together in some way.  But, as Allstate conceded at oral argument, it had argued in its brief that the subsections are completely separate.  We will not consider arguments raised for the first time at oral argument.  
Mitchell v. Gamble
, 207 Ariz. 364, ¶ 16, 86 P.3d 944, 949-50 (App. 2001).  Although we conclude subsections (b) and (c) do have a relationship, we do not do so based on any new argument raised by Allstate.

2:
Section 20-1503, A.R.S., provides that all fire insurance policies issued in Arizona must conform to the 1943 version of the New York standard fire policy and that any such policy is to be designated as the “Arizona standard fire policy.”

3:
Tritschler has not argued, and we do not decide, whether the Quality Vendor Program conforms to the terms of the policy.

4:
We do not address whether the amounts Allstate paid would fulfill its obligations under the policy after a deduction for depreciation.

5:
We note that our construction of Tritschler’s policy provisions results in a procedure similar to that contained in the policy provisions in the out-of-state cases:  the insurer pays actual cash value, and if the insured repairs or replaces the property, the insured 
may be
 entitled to an additional payment.  

6:
Allstate contends 
Weidman
 supports its position because the court there stated that the actual cash value recovery was limited to the amount “actually and necessarily spent to repair or replace the damaged dwelling.”  745 N.E.2d at 298.  But the policy in 
Weidman
 specifically included a limitation on the actual cash value recovery. 
 Id
. at 295.  In contrast, the restriction on which Allstate relies is contained in subsection (c), building structure reimbursement, not in subsection (b) pertaining to actual cash value.  We note further that the actual cash value in 
Zuckerman
 was limited to the amount actually spent, but the supreme court still expressed doubt that overhead and profit could be deducted.  
Zuckerman v. Transamerica Ins. Co.
, 133 Ariz. 139, 141 n.2, 650 P.2d 441, 443 n.2 (1982).

7:
We do not consider whether the remaining limitation provisions of the policy may become effective at some point.  We simply determine whether Allstate may routinely deduct overhead and profit from actual cash value when a general contractor customarily would be used if the property were repaired.  

COMMENTS AND ANNOTATIONS
Text Box 1:
Text Box 2:

TEXT BOXES
OCT 12 2006

FILED BY CLERK

COURT OF APPEALS

DIVISION TWO