NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

GEORGE R. HAMMON, et al., *Plaintiffs/Appellants*,

*v.*

UNIT II PHASE 2 FUNDING LLC, *Defendant/Appellee*.

No. 1 CA-CV 19-0190
FILED 12-19-2019

Appeal from the Superior Court in Mohave County
No.  S8015CV201700079
The Honorable Lee Frank Jantzen, Judge

**AFFIRMED**

COUNSEL

The Barlow Law Firm LLC, Fredonia
By Matthew Israel Barlow
*Counsel for Plaintiffs/Appellants*

Ramras Legal PLC, Phoenix
By Ari Ramras
*Counsel for Defendant/Appellee*

<hr />

## MEMORANDUM DECISION

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge David D. Weinzweig and Judge John C. Gemmill[1] joined.

<hr />

**H O W E**, Judge:

**¶1**    George Hammon and Christine Cox appeal the trial court's grant of summary judgment in favor of Unit II Phase 2 Funding ("Unit II Funding"). Hammon and Cox also appeal the trial court's denial of their motion for summary judgment and their motion for a new trial.[2]

## FACTS AND PROCEDURAL HISTORY

**¶2**    In 1986, members of a church group known as Centennial Park Group formed the Deseret Land and Trust ("Trust") and acquired two parcels of land totaling around 1,000 acres in Mohave County, now known as Centennial Park. The Trust's purpose was to acquire property and provide the property for the use of its members. A minimum contribution of $1,000 was required to become a member of the Trust. The relationship between the Trust and its members was that of trustee and beneficiary. The Trust held legal title to the property in the name of the Trust and certificates were to be given to members to show their beneficial interest in the Trust estate, although certificates were never issued. The certificates were supposed to entitle members to the specific Trust property described in their certificates.

**¶3**    Hammon and his father jointly contributed $10,000 in earnest money, which was considered their contribution to become members of the Trust and reserved five-acres of land for their use. According to the Trust,

<hr />

[1]    The Honorable John C. Gemmill, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article VI, Section 3 of the Arizona Constitution.

[2]    We do not consider Hammon and Cox's argument that the trial court erred in denying their motion for a new trial because the argument was first raised in their reply brief. *See State v. Edmisten*, 220 Ariz. 517, 522 ¶ 10 n.2 (App. 2009).

the five-acre tract consisted of four lots, including Lot 10, which is the focus of this dispute.

¶4  In the late 1980s, Hammon took possession of the five-acre tract and transferred his interest in the Trust to Cox and another one of his religious "wives." Between the late 1980s and early 1990s, Hammon and Cox kept horses and dogs on Lot 10 and built a barn, boxed stalls, and corrals. They also installed a septic system and electricity and water lines to service the property.

¶5  In 1990, the Trust informed its members that it would be subdividing the Trust property "to work towards deeding" the subdivided parcels to the individual members, development costs would be assessed on a lot-by-lot basis, and members needed to submit applications to obtain deeds for their parcels. Cox applied for other lots, but the record is unclear whether she applied for Lot 10.

¶6  In October 1991, Cox entered into a one-year, renewable lease agreement with the Trust to rent Lot 10 for one dollar per year and pay the property taxes. The lot numbers shown on the lease are illegible, but the parties do not dispute that Lot 10 was covered under the lease. The lease agreement provided that the Trust would "deed the subject property" to Cox once the subdivision process was completed "for the consideration of and upon receipt to Lessor of the $1,500.00 per acre and the amount of subdivision costs, assessments, etc., as equitably and equally prorated to this property." Cox did not renew the lease after the first year and stopped paying rent but continued to pay the property taxes to the Trust until around 2011, when she started paying the taxes directly to the state.

¶7  In the early 1990s, after the lease was executed, Hammon and Cox moved a single-wide trailer onto the property and began building over the trailer to convert it into a house. Around 1998, Hammon and Cox, along with their son, moved into the completed house on Lot 10 where they lived for about five years. Around 2003, Hammon and Cox moved to their other property on Johnson Avenue, outside Centennial Park, leaving their son and his family to live in the house. Hammon and Cox continued to visit and use the property to keep horses and dogs and to raise livestock. They also continued to use a room in the home as an office for Hammon's trucking company until about 2015. In 2010, the Trust began invoicing Cox for subdivision costs that she was required to pay under the terms of the lease to obtain the deed to the property. Cox did not satisfy the lease requirements to obtain the deed to the property because she did not pay for the subdivision costs; she and Hammon believed that while some of the

improvements were reasonable, others were too extravagant and expensive.

¶8        The Trust sold the Trust property in July 1998 to Basic Investment Corporation ("Basic"), a financial arm of the Trust. Basic then sold a portion of the property, which included Lot 10, to Unit II Phase 2 LLC ("Unit II LLC"), which was managed by another Trust member, in April 2008. In February 2009, Unit II LLC borrowed money (to begin subdivision improvements) from Unit II Funding, secured by a deed of trust, to improve the subdivisions. Unit II LLC later defaulted on the loan. Before the property was auctioned, however, Unit II Funding informed Hammon in writing that he could lose his interest in Lot 10 if he did not pay the principal amount due for Lot 10. Hammon and Cox did not pay the principal amount due for Lot 10 and the trustee sold the property at auction in December 2010. Unit II Funding was the successful bidder and, following the sale, notified Hammon and Cox that if they failed to pay their past due taxes and development costs, they might forfeit their rights to purchase Lot 10 under the lease. Hammon and Cox did not pay the subdivision costs or taxes owed but instead brought this action to quiet title by adverse possession.

¶9        Unit II Funding moved for summary judgment arguing that Hammon and Cox's possession of Lot 10 was not hostile because they signed a lease with the Trust and never made a clear disclaimer of their tenancy. Hammon and Cox also moved for summary judgment arguing that they acquired title to Lot 10 by adverse possession. The trial court granted Unit II Funding's motion for summary judgment, finding that Hammon and Cox did not acquire title to Lot 10 by adverse possession because they had possessed the lot under a lease. As a result, the trial court denied Hammon and Cox's motion for summary judgment. Hammon and Cox then moved for a new trial, which the trial court denied. Hammon and Cox timely appealed.

## DISCUSSION

¶10        Hammon and Cox argue that the trial court erred by granting Unit II Funding's motion for summary judgment because they acquired title to Lot 10 by adverse possession. We review the trial court's grant of summary judgment de novo. *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 519 ¶ 48 (App. 2006). To succeed on a claim of adverse possession, the plaintiff must show that the possession was hostile, exclusive, open and notorious, under a claim of right, and continuous for the statutory period. *Lewis v. Pleasant Country, Ltd.*, 173 Ariz. 186, 189 (App. 1992).

4

¶11          Hammon and Cox's possession of Lot 10 was permissive under the terms of the lease as a matter of law and therefore not hostile. When a person obtains possession of property under a lease, A.R.S. § 33–234 prohibits that person from claiming title to the property against the landlord. When a lessee holds over and retains possession after the expiration of the lease, the holding over creates a tenancy from month-to-month. A.R.S. § 33–342. If the holdover tenancy is consensual, the terms and conditions of the original lease govern the holdover tenancy. *Pima Cty. v. Testin*, 173 Ariz. 117, 119 (App. 1992). A person whose possession is initially permissive may bring an adverse possession claim upon a clear disclaimer of the true owner's title. *See Lewis*, 173 Ariz. at 191.

¶12          While Hammon and Cox initially entered the property as members of the Trust, the board of trustees allowed Hammon and Cox to continue their possession and use of Lot 10 under the terms of the lease. Even though Cox testified that she had never renewed the lease, the fact that she held over after the expiration of the lease created a month-to-month tenancy governed by the original terms of the lease. *See* A.R.S. § 33–342; *see also Testin*, 173 Ariz. at 119. Cox even continued to pay the property taxes to the Trust, as required under the lease, until around 2011, when she started making the payments directly to the state. As a result, the lease continued beyond the initial one-year term.

¶13          Even though Basic and Unit II Funding were not parties to the lease agreement, they were bound by Cox's lease with the Trust. A subsequent purchaser with notice of a lease is bound by it. *Keck v. Brookfield*, 2 Ariz.App. 424, 427 (App. 1965). John Timpson, the President of Basic, and Sam Zitting, the sole member of Unit II Funding, were also members of the Trust. Because Timpson and Zitting were members of the Trust they were both constructively aware of the lease between Cox and the Trust. Zitting specifically admitted that he had property next to Lot 10 and that he was aware of the lease agreement. Because Basic and Unit II Funding were aware of the lease, they were bound by it. *See Keck*, 2 Ariz.App. at 427. Additionally, as subsequent purchasers, they had no duty to inquire about Hammon and Cox's possession of Lot 10, as their possession was consistent with the lease. *See Valley Nat'l Bank of Ariz. v. Avco Dev. Co.*, 14 Ariz.App. 56, 61 (App. 1971). Therefore, Hammon and Cox's possession of Lot 10 continued to be permissive even after the property was sold to Basic and Unit II Funding and could only become adverse upon a clear disclaimer of their tenancy. *See Lewis*, 173 Ariz. at 191.

¶14          Cox and Hammon never made a clear disclaimer of their tenancy and the improvements they made to Lot 10 were not enough to

constitute such a disclaimer. "Where the acts of the tenant while in possession under a lease are not inconsistent with his or her position and rights as a lessee, the possession cannot operate to give him or her title by adverse possession." 52 C.J.S. Landlord & Tenant § 684. Cox admitted she had never made any disclaimer of the lease and the parties do not argue on appeal that they made any clear disclaimer of their tenancy to the Trust, Basic, or Unit II Funding. The lease Cox signed allowed Hammon and Cox to make improvements to the property and allowed them to remove any buildings, structures, or other improvements if the lease terminated. While Hammon and Cox made several improvements to the property, these improvements were consistent with their rights under the lease and would not constitute a clear disclaimer of their tenancy. *See id.* Because no clear disclaimer of their tenancy was made, Hammon and Cox's possession of Lot 10 remained permissive and did not satisfy the hostility requirement for a claim of adverse possession.

¶15 Hammon and Cox argue that they acquired an "equitable owner" interest in Lot 10 under the 1987 Trust Agreement, evidenced by certificates of membership, and that the Trust held the property for their benefit since that time. Hammon and Cox admitted, however, that the Trust owned the property and that they never received title to Lot 10. While the Trust does state that certificates of membership "shall entitle the member of record trust estate property described on or attached to said certificate," Hammon admitted that no certificate was issued, and the record contains no certificate. Therefore, Hammon and Cox's argument that they purchased and obtained ownership of Lot 10 through the Trust fails.

¶16 Hammon and Cox also argue that no landlord-tenant relationship existed, that no lease existed, that no lease was intended, that the terms of the lease were uncertain and indefinite, and that Unit II Funding could not enforce the terms of the lease due to a lack of privity. Because these arguments were raised for the first time in Hammon and Cox's motion for a new trial, they are waived. *See Nickerson v. Green Valley Recreation, Inc.*, 228 Ariz. 309, 315 ¶ 9 (App. 2011).

¶17 Hammon and Cox argue last that the trustee sale to Unit II Funding is void because the trustee sale was not properly noticed. But a trustee's deed constitutes conclusive evidence that the proper notice requirements were met in favor of purchasers for value and without actual notice. A.R.S. § 33–811(B). Actual notice under § 33–811(B) refers to knowledge of any deficiency in the sale procedure. *See Main I Ltd. P'ship v. Venture Capital Const. and Dev. Corp.*, 154 Ariz. 256, 259 (App. 1987). Knowledge of the trustee is not imputed to the beneficiary. A.R.S.

§ 33–811(B). Because Hammon and Cox do not argue that Unit II Funding had actual notice of any alleged defects in the notice of sale, the trustee's deed serves as conclusive evidence that the proper notice requirements were met. *See* A.R.S. § 33–811(B). As a result, the trustee's sale is valid.

**¶18** Because Hammon and Cox were tenants under the lease, and no clear disclaimer of the lease was made, they failed to prove that their possession of Lot 10 was hostile. As a result, their claim to quiet title by adverse possession failed, and the trial court correctly granted summary judgment in favor of Unit II Funding.[3]

## CONCLUSION

**¶19** For the foregoing reasons, we affirm. Unit II Funding requests its attorneys' fees incurred on appeal pursuant to A.R.S. § 12–1103(B) and Arizona Rule of Civil Appellate Procedure 21. In our discretion, we grant Unit II Funding's request upon compliance with ARCAP 21.



AMY M. WOOD • Clerk of the Court
FILED: AA

---

[3] We need not address Hammon and Cox's argument that the trial court abused its discretion in denying their motion for summary judgment because the denial of summary judgment is not appealable when we affirm summary judgment against that party. *See McCallister Co. v. Kastella*, 170 Ariz. 455, 457 (App. 1992).